This case was originally assigned to another Judge and was reassigned on October 7, 1997.
The appellant, Michael N. Norris, appeals from his conviction and sentence of death for the capital offense of murder for the murders of Sarah Tracy Hooper, Rodney Ray Clark, and Damon Herbert by one act or pursuant to one scheme or course of conduct, of two or more persons. See § 13A-5-40(a)(10), Code of Alabama 1975.
The trial court sentenced Norris to death after considering the jury's recommendation, by an 8-4 vote, that Norris be sentenced to life imprisonment without the possibility of parole.[1] In sentencing Norris, the court found the following aggravating circumstances: (1) that Norris had been convicted in 1974 of murder, a felony involving the use or threat of violence to the person, § 13A-5-49(2); and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). In finding no statutory (§ 13A-5-51) or nonstatutory (§ 13A-5-52) mitigating circumstance, the court noted:
 "Upon consideration of all the evidence brought forth at the trial of this case, the sentence hearing and the pre-sentence report, the Court finds that the only evidence arguably presented in mitigation was the fact that the Jury did recommend life without parole and that the prior murder conviction was during a time that the defendant was a teenager and that offense arose out of a dispute between gang members. Since that time the defendant has only been convicted of a misdemeanor assault and traffic offenses. Other evidence in mitigation was the fact that the defendant's mother and brother testified at the sentencing hearing on the defendant's behalf and supplied the Court with insight into the defendant's family background. Both the defendant's mother and brother believe in the defendant's innocence."[2]
(C.R. 151.)
We must remand this case for resentencing because we find that Norris is *Page 850 
correct in his claim that the prosecution failed to establish beyond a reasonable doubt, as required by § 13A-5-45(e), the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses.[3]
Because a finding that the capital offense was especially heinous, atrocious, or cruel rests on the particular facts of the case, an understanding of the facts is necessary. The three victims died as a result of gunshot wounds to the head. The shootings occurred in the early morning of March 5, 1993, at Rosa's Place, a bar that catered to motorcyclists. All patrons except the three victims and Norris and his codefendant Brian Carrier[4] had left the bar by 1:45 a.m. The only two witnesses to the capital offense were Carrier and William R. Henson, the bartender. Although there were discrepancies between the testimonies of these two eyewitnesses as to the particulars preceding and following the murders, both agreed that Norris walked up to the three victims, who were sitting in a corner booth, and shot them in rapid succession.
Henson testified that, up to the time of the shootings, there had been no communication between Norris or Carrier and the three victims. He further testified, as follows:
 "A. [Norris and Carrier] walked over toward what — to leave from that point to go to the door and also to go over to where the [victims] were at. They walked over to that direction. And I thought they were going over to tell [the victims], `See you later,' or `Good night,' or whatever. And as [Norris] walked up behind [Hooper], I heard a shot, and [Hooper] went forward. And then I immediately turned around and I heard — well, I heard [Norris] say, `What are you going to do now, mother fuckers?' [When he said that, his arm was moving, and I don't recall which direction it was moving. (R. 877.)] And I turned to get my 9 mm. [gun].
"Q. Where was your 9 mm. at that time?
"A. Beside the cash register under some money bags.
"Q. And how far was that from you?
 "A. I was turning in one step, trying to lift up the bags and get to the pistol.
"Q. So, . . . you had to turn your back to them . . .?
"A. Yes, ma'am.
"Q. . . . [W]hat happened then?
 "A. As I was getting my 9 mm., I was hearing shots. And when I came back around — it's basically a blur to me. [When I came back around, [Clark] was up against the wall. And I couldn't see [Herbert]. (R. 945.) [Herbert] was in the floor. (R. 974.)] I recall [Norris] coming back toward me, and I pointed my 9 mm. at him.
"Q. What was [Norris] doing as he walked back toward you?
 "A. He had his pistol in his hand, and I figured I was going to be shot next."
(R. 862-64.)
"Q. How many shots did you hear from over in that bar area? *Page 851 
"A. I think it was four."
(R. 865.)
Henson also testified to the following events that he said occurred after Norris fired the four shots: Norris pointed his gun at Henson, and Henson pointed his gun at Norris. Norris then told Henson, "Tell them that you've been robbed. My life is in your hands. And we'll see if you've got the balls not to squeal." (R. 879.) He also warned that if Henson did report Norris, Henson "was history." Then Norris ordered Henson to fire his weapon. Henson jerked his pistol to the left to fire one shot into the wall, but he "evidently jerked off three rounds" and then pointed his weapon at Norris again. Then Norris and Carrier left. Henson telephoned the police and paramedics. Sometime between the time Norris and Carrier left and the time the police and paramedics arrived, Henson heard moaning and raspy breathing from one of the victims, and he determined that Herbert was still breathing.
Carrier testified that he was still sitting at the bar when he heard the first shot and that when he heard this shot, he turned around and saw Hooper falling from a chair at the corner booth. He further explained that after this first shot, Herbert looked as if he were reaching for a gun in his jacket, and Norris stepped up in the booth area, grabbed Herbert's arm, said to Herbert, "Oh, no, don't do that, take it like a man." (R. 1922), and then shot him. Carrier also testified that he then saw Norris reach across the table and shoot Clark. Carrier further testified, as follows:
"Q. How much time had elapsed?
"A. It happened so quick . . . .
". . . .
"Q. And after the third shot what happened?
 "A. [Norris] started walking back up toward the bar. And he said, `It's all on you, [Henson].' And there was one of them still breathing. And he said, `Wait a minute, I've got to go finish the job.' And he walked back over and shot another one."
(R. 1922.)
Evidence, independent of that provided by the testimonies of the two eyewitnesses, established that when the police arrived at the scene at 2:10 a.m., one victim was breathing with difficulty; Hooper had no pulse (she was pronounced dead by paramedics at 2:13 a.m.); and the other male did not appear to be breathing. The coroner who performed the autopsy on Hooper's body testified that there was a gunshot wound on the left side of her forehead that had been inflicted by a weapon held less than an inch away; and that, in his opinion, he "would expect that [wound] to be a very rapidly fatal gunshot wound and to cause immediate incapacitation or almost immediate incapacitation" (R. 1337). The coroner further testified that he also performed an autopsy on Clark's body; that Clark had been shot in the head near the midline from the front; that the weapon was fired with its muzzle more than a distance of approximately 12 to 20 inches from the victim's head; and that, in his opinion, "a wound such as that [would] be a very rapidly incapacitating gunshot wound and . . . a [very] rapidly fatal gunshot wound" (R. 1325, 1356). The coroner who performed the autopsy on Herbert's body testified that there were two gunshot wounds to the head: one in the right forehead, which travelled from front to back and slightly downward, and the other behind the right ear, which travelled from back to front, slightly downward, and toward the center. He testified that "both are potentially lethal, and both would result in rapid incapacitation" (R. 1398); that they caused "considerable destruction" of *Page 852 
the right hemisphere of the brain; that the right cerebral hemisphere was "pretty well destroyed by the bullet [travelling from front to back] and the fragments of bone" (R. 1415); that there was no evidence that they were near contact wounds; and that Herbert died at 1:15 p.m. on March 5, 11 hours after the shootings. The coroner also noted that Herbert had received medical treatment.
In finding that the evidence established that the multiple-murder capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, the trial court simply concluded so; it did not identify the specific facts upon which it based this conclusion. Thus, we cannot discern from the trial court's order upon what facts or basis the court relied in deciding that the killings were especially heinous, atrocious, or cruel. However, we note that the prosecution's closing argument to the jury pertaining to the aggravating circumstances it considered to be applicable was, in its entirety, as follows:
 "And as aggravating circumstances, I'd ask you to reflect back on the facts of this case, a totally senseless act by this man, wherein three people lost their lives for absolutely no reason. Three human beings cut down, minding their own business, that plus the fact that this man once before has been convicted of taking the life of another person. And because of that, ladies and gentleman, we ask that you sentence him to the appropriate punishment, which is death."
(R. 2433-34.)[5] To the trial court, the prosecutor argued, "Your Honor was here at the trial and is well aware of the circumstances under which these people died in that booth there, pretty much execution style where these three people were shot simultaneously." (R. 2530.) The attorney general asserts, in his brief to this court, that the finding of this circumstance was properly based on the facts that the three killings were execution-style[6] and that the latter two victims, having watched the prior shooting(s), "must have been only too aware of their ultimate demise" (State's brief, p. 36). He also appears to rely on the fact that Herbert was shot a second time, after having been rendered helpless.
We find the following recent discussion by the Alabama Supreme Court in Ex parte Clark, 728 So.2d 1126, (Ala. 1998), to be pertinent to the question before us: *Page 853 
 "In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court of the United States held that the application of certain state death penalty statutes violated the Eighth Amendment to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that those statutes' lack of principled standards to prevent the sentencing authority from arbitrarily and capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g., id. at 310 (Stewart, J., concurring); id. at 311 (White, J., concurring).
 "Since Furman, many states have revised their death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See Maynard v. Cartwright, 486 U.S. 356, 362 (1988). The Supreme Court's post-Furman cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a `principled way to distinguish' cases in which the death penalty is appropriate from cases in which it is not. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 433 (1980). The Supreme Court has held that the `especially heinous, atrocious, or cruel' aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See Cartwright, 486 U.S. at 365-66 (upholding the Oklahoma Court of Criminal Appeals' interpretation of the `especially heinous, atrocious, or cruel' aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
 "In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir. 1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala. Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334
(Ala. 1981)) (emphasis added)."
Thus, in determining whether the prosecution presented sufficient evidence to establish beyond a reasonable doubt that the three murders were especially heinous, atrocious, or cruel, it is imperative that we continue to use a "consistent and narrow interpretation" of this aggravating circumstance. It is this narrow interpretation and a consistent application of it that render this aggravating circumstance constitutional. *Page 854 
The fact that Norris killed three people does not support a finding that the murders were especially heinous, atrocious, or cruel, as the prosecution argued. "The first degree murder of two or more victims is not, by definition, especially heinous, atrocious, or cruel. Ex parte Kyzer, 399 So.2d 330 (Ala. 1981)." Ex parte Ford, 515 So.2d 48, 52 (Ala. 1987), cert. denied,484 U.S. 1079 (1988). Cf. Ponder v. State, 688 So.2d 280, 283
(Ala.Cr.App. 1996) ("The death of two or more people during one course of conduct is not a statutory aggravating circumstance contained in [§ 13A-5-49].").
Thus, the prosecution had to provide evidence of some factor other than that the offense was a multiple-homicide capital offense. In reviewing the finding that the murders were especially heinous, atrocious, or cruel in light of the evidence presented by the prosecution, we have considered several generally recognized factors, as discussed below.
 A.
One factor that is indicative of "especially heinous, atrocious, or cruel" is the infliction on the victim of physical violence beyond that necessary or sufficient to cause death. See generally Thomas M. Fleming, Annot., Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder Was Heinous, Cruel, Depraved, or the Like — Post-Gregg Cases, 63 A.L.R. 4th 478 (1988).
 "[The infliction of this kind of physical injury] may be accomplished either or both by subjecting the victim to injury of a different nature than, and in addition to, that proximately causing death, or by the repeated infliction of injuries of the same nature as that causing death, where at least some of the injurious acts are separated by a lapse of time sufficient enough to cause the victim prolonged suffering . . . . Such additional or repeated violence is often considered cruel . . . where inflicted on a living and conscious victim . . . ."
Id. at § 2[a], p. 488.
Under the facts before us, no victim was subjected to additional injury of a nature different from the gunshots that caused their deaths. Herbert was the only victim on whom injury of the same nature as that causing his death was inflicted: he was shot twice.
However, as noted above, (1) the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and (2) the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted.
The Alabama Supreme Court has addressed this latter requirement in Ex parte Clark, where the court stated the following:
 "In Bush v. State, 695 So.2d 70 (Ala.Cr.App. 1995), affirmed, Ex parte Bush, 695 So.2d 138 (Ala. 1997), the Court of Criminal Appeals addressed the defendant Bush's argument that his crime, an execution-style murder, was not `especially heinous, atrocious or cruel' and that the trial court therefore erred in finding the aggravating circumstance:
 "`While the [defendant] correctly points out that we have upheld findings of the existence of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel in cases where the victim suffered unnecessary torture, he ignores the line of cases holding that execution-type slayings evincing a cold, calculated design to kill fall into the category of especially heinous, atrocious, or cruel. [Citations omitted.] *Page 855 
 "`In fact, the precise issue raised . . . here was raised in the first trial, and in Bush I [Bush v. State, 431 So.2d 555 (Ala.Cr.App. 1982)], where in affirming [the capital sentence], we specifically held:
 "`"[F]or the reasons set out by the trial court, this capital offense was especially heinous, atrocious or cruel when compared to other capital offenses. Execution-type slayings evincing a cold, calculated design to kill, fall into the category of heinous, atrocious or cruel. Vaught v. State, 410 So.2d 147 (Fla. 1982); Combs v. State, 403 So.2d 418 (Fla. 1981); Armstrong v. State, 399 So.2d 953 (Fla. 1981); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923 . . . (1976). We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. Odom v. State, 403 So.2d 936 (Fla. 1981). However, when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious or cruel. Hargrave v. State, 366 So.2d 1, 5 (Fla. 1978)."'
 "`431 So.2d at 560-61. In reviewing our opinion in Bush I, a portion of which is quoted above, the Alabama Supreme Court stated, "We concur with the appellate court's conclusion that Bush's death sentence was properly arrived at and is appropriate." Ex parte Bush, 431 So.2d [563] at 565 [(Ala. 1983)]. See also Ex parte Rieber, [663 So.2d 999, 1003-05 (Ala. 1995)] (quoting Bush I with approval in upholding the trial court's finding that the execution-type killing of the victim was especially heinous, atrocious, or cruel).'
 "695 So.2d at 84. In Bush, the trial court made the following findings in its sentencing order:
 "`"The Court does find from the evidence presented during the 1991 trial, which this Court has carefully considered, that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses. This finding is based upon the evidence at trial that Larry Dominguez had already been shot and was stumbling or staggering out of the restroom when the Defendant shot him again. The evidence at trial was that the murder was committed so that the Defendant could eliminate an eyewitness to the robbery.
 "`"The Court finds from the evidence presented that William Bush deliberately shot Larry Dominguez in the head in a calculated fashion to avoid later identification after the victim had already been critically wounded. As previously noted, the killing of Larry Dominguez was an execution-type killing and was followed within approximately one hour by another murder of the same nature."'
"Bush v. State, 695 So.2d at 84-85 (emphasis added).
 "This Court has affirmed findings that certain `execution style' murders were `especially heinous, atrocious or cruel.' See, Rieber v. State, 663 So.2d 985, 992-93 (Ala.Cr.App. 1994), aff'd, 663 So.2d 999 (Ala. 1995) (the victim had been stalked by the defendant before the murder; the victim was very much afraid of the defendant; she was robbed and was shot in the wrist and then in the *Page 856 
head; she was alive when she was found, but subsequently died); Wright v. State, 494 So.2d 726, 744 (Ala.Cr.App. 1985), aff'd, 494 So.2d 745 (Ala. 1986) (trial court found that the two victims were murdered `in order that they would not be witnesses' and that they `were each shot in the head [and] slowly died in a pool of blood'); Lawhorn v. State, 581 So.2d 1159, 1174 (Ala.Cr.App. 1990), aff'd, 581 So.2d 1179 (Ala. 1991) (victim was run down and was `confronted with the barrel of a shotgun in his face'; he was shot and shot again after getting back up; he was then shot three times while lying on the ground `trapped and making gurgling noises'). In those cases cited here, the victims were aware of what was happening to them.
 "The victim in this case sustained five shots to the back and the head, with a final sixth shot behind the ear. Although the prosecution tried to imply during the trial that the victim had tried to `run for the woods' (R.T. at 875), the record indicates that whether Posey was in fact even conscious and aware after the initial shots were fired would be a matter of mere speculation . . . . The State urges us to hold that the `execution-style' murder in this case, for which the record does not reflect torture of the victim, is nonetheless `especially heinous, atrocious or cruel.' Such an expansion of the aggravating circumstance set out in § 13A-5-49(8) to encompass a murder not involving torture, merely because the State labels the murder an `execution-style' slaying would abandon the very interpretation that the Eleventh Circuit held critical to the constitutional application of that aggravating circumstance. Indeed, the Supreme Court of the United States has held that a state supreme court's failure to apply its previously recognized limiting construction of an aggravating circumstance, which required a finding of torture or aggravated battery of the victim, rendered the application of the aggravating circumstance unconstitutional. Godfrey [v. Georgia], 446 U.S. [420] at 429, 432 [(1980)]."
443 So.2d at 973 (emphasis in original). See also Fleming, supra § 2[b], at 493 ("Many courts have recognized that in order to sustain a finding of cruelty or torture, the evidence must establish beyond a reasonable doubt that the victim, before or when assaulted, was conscious and aware of what was happening or about to happen.") (footnote omitted).[7] See, e.g., Stouffer v. State, 742 P.2d 562, (Okla.Crim.App. *Page 857 
1987), cert. denied, 484 U.S. 1036 (1988) (where "[t]here was no reason to believe from the evidence that [the victim] was conscious after the first shot" to the head while she was asleep and "[s]he expired within minutes at the scene," the court found that the evidence did not support a finding that the murder was especially heinous, atrocious, or cruel because there was no evidence of physical or mental suffering). See also Knotts v. State, 686 So.2d 431, 448
(Ala.Cr.App. 1995) (in determining that the murder was especially heinous, atrocious, or cruel, the court considered "the terror that [the victim] experienced from the time she was first shot until she lost consciousness" after being shot a second time and hearing a third shot that she could have believed had been fired in the direction of her child), aff'd, 686 So.2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.ED.2d 706 (1997).
In Ex parte Clark, the Alabama Supreme Court specifically held that the victim must have been not only alive but conscious and "aware" after the initial assault, i.e., that he was "aware" of his suffering. Thus the following language in Bush I, 431 So.2d at 560-61, has been qualified by Ex parte Clark to require that the victim be conscious and "aware" after the initial assault: "when a defendant deliberately shoots a victim in the head in a calculated fashion to avoid later identification, after the victim has already been rendered helpless by gunshots to the chest, such `extremely wicked or shockingly evil' actions may be characterized as especially heinous, atrocious, or cruel."
In determining whether Herbert's murder was especially heinous, atrocious, or cruel based on the facts before us, we need address only the critical inquiry of whether the prosecution established that Herbert was conscious and aware after Norris fired the first shot, i.e., whether Herbert was "aware of what was happening" to him, Ex parte Clark, 443 So.2d at 973. (Such an awareness could have encompassed unnecessary physical and psychological torture or suffering.)
The prosecution offered no evidence from which we can reasonably conclude that Herbert was conscious and aware after he was shot the first time. The only express mention of his state of consciousness was Henson's testimony that, in his telephone conversation to Norris after Herbert's funeral, he told Norris that Herbert had never regained consciousness. The coroner testified merely that both wounds were "potentially lethal" and that "both would result in rapid incapacitation." Thus, the evidence did not establish that Herbert was aware of and agonized over his ultimate doom.
Moreover, the prosecution presented no evidence that Herbert would have felt pain in the event he was unconscious. Compare Brown v. State, 663 So.2d 1028, 1934 (Ala.Cr.App. 1995) (the especially heinous, atrocious, or cruel aggravating circumstance was supported by the medical examiner's testimony that "although the victim was unconscious he still would have been able to feel pain").
In so holding, we have considered and rejected the proposition that Henson's testimony of Herbert's moaning after the second shot could satisfy the prosecution's burden of showing that Herbert was aware of pain. See State v. Hinchey, 165 Ariz. 432,799 P.2d 352, 358 (Ariz. 1990) (after stating that to qualify as a "`committed in an especially cruel manner' aggravating circumstance, the defendant's acts must have been committed while the victim was conscious [because,] otherwise, the evidence is inconclusive as to whether the victim actually suffered pain or distress," the court found that evidence of the *Page 858 
victim's moaning did not establish that the crime was committed in an "especially cruel" manner; it noted, "At oral argument, the State conceded that the victim's moaning was the only evidence she suffered pain and that her moaning may have been an involuntary, reflexive act"; "nor did the State prove beyond a reasonable doubt that the victim was conscious and experiencing pain after she was shot through the brain") (emphasis in original), cert. denied,499 U.S. 963 (1991); Clark v. State, 443 So.2d 973, 977 (Fla. 1983) (evidence that the victim moaned after being shot in the head was insufficient to establish that the murder was conscienceless or pitiless and unnecessarily torturous where "there was no evidence of whether she was conscious after being shot, nor did the medical examiner indicate how long [she] survived or what degree of pain, if any, she suffered"), cert. denied, 467 U.S. 1210
(1984). Compare Barbour v. State, 673 So.2d 461, 471 (Ala.Cr.App. 1994) (although, in finding that the murder was especially heinous, atrocious, or cruel, the court noted that "the victim moaned after she was stabbed," the court also relied on the trial court's findings which included in part the findings that the victim was "savagely beaten . . . into a stupefied state or into a state of unconsciousness," thus suffering physical pain and psychological fear and further that she was raped as she lay helpless), aff'd, 673 So.2d 473 (Ala. 1995), cert. denied,518 U.S. 1020 (1996); Berard v. State, 486 So.2d 458, 473
(Ala.Cr.App. 1984) (in discussing the trial court's reconsideration of the aggravating circumstance on remand for resentencing, Presiding Judge Bowen noted that defendant admitted in his confession, not only that the two victims were "moaning and groaning," but that they were also in "misery" for a period of time after he shot them the first time) (Bowen, P.J., concurring in result only), rev'd on other ground, 486 So.2d 476
(Ala. 1985); Spears v. State, 900 P.2d 431, 448 (Okla.Crim.App. 1995) (evidence that the victim hollered and moaned during the beating that preceded his death and testimony by a witness that he could tell the victim was hurting was sufficient to rationally support the conclusion that the victim was conscious during the beating), cert. denied, 516 U.S. 1031 (1995). We cannot conclude, on the evidence presented, that Herbert suffered any conscious pain or that his moaning was a conscious, deliberate act.
As the court in Ex parte Clark noted on the facts under its review, we likewise note under the facts before us that "the record indicates that whether [the victim] was in fact even conscious and aware after the initial shot [was] fired would be a matter of mere speculation." 443 So.2d at 973. (We find this conclusion to also apply in regard to the question whether Herbert was conscious or aware anytime during the 11 hours he lingered after being shot and, if so, whether he suffered extreme pain during that time.)[8]
Because the prosecution failed to satisfy its burden in this regard, we need not address the question whether the shots were separated by an appreciable lapse of time sufficient to have caused Herbert prolonged suffering.
 B.
Another factor to consider in determining whether this aggravating circumstance *Page 859 
has been proven beyond a reasonable doubt is whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death.
 "Where the victim was not subjected before [or] contemporaneously with . . . death to additional injury of a nature different than that causing death, or to repeated injuries of the same nature as that causing death inflicted other than in rapid, uninterrupted succession, a principal focus of inquiry in determining whether the murder was especially heinous, cruel, depraved, or the like has been whether the victim lost consciousness or died instantaneously or quickly after the fatal attack, without time for appreciable suffering, or instead lost consciousness or died only after a lapse of time significant enough to permit such suffering."
Fleming, supra § 2[a], at 489. See also Bush I, 431 So.2d at 560 ("We recognize that an instantaneous death caused by gunfire is not ordinarily a heinous killing. Odom v. State, 403 So.2d 936
(Fla. 1981)."); Oats v. State, 446 So.2d 90, 95 (Fla. 1984) ("a pistol shot straight to the head of the victim does not tend to establish this aggravating circumstance"); Fleming, supra § 2[b], at 493 ("evidence that the victim died instantaneously from a single gunshot while facing away from the defendant, and that he or she had no awareness of what was about to happen, may preclude a finding that the murder was especially heinous, atrocious, or cruel, even where the offense was entirely unprovoked, the victim was defenseless, and the defendant engaged in substantial premeditation of the act") (footnote omitted). Compare Ex parte McNair, 653 So.2d 353, 360 (Ala. 1994) (noting that the evidence suggested that the elderly victim "remained conscious for several minutes following the attack, alone on the floor of her kitchen to die"), cert. denied, 513 U.S. 1159
(1995); Ex parte Jefferson, 473 So.2d 1110, 1113 (Ala. 1985) (in finding that the murder caused by multiple cuts to the victim's throat was especially heinous, atrocious, or cruel, the court noted, "Of special significance is the fact that the victim did not lose consciousness until several minutes after the attack."), cert. denied, 479 U.S. 922 (1986).
We need examine this factor only as to victims Hooper and Clark. Here, again, the critical inquiry is whether the victims were aware or conscious. The prosecution did not produce any testimony that Hooper or Clark did not die or loose consciousness immediately after having been shot in the head or that they were conscious or aware for any appreciable time. The evidence established only that when the police arrived shortly after the shootings, Hooper had no pulse and Clark did not appear to be breathing; that the wound to Clark was "very rapidly incapacitating" and "very rapidly fatal"; and that the wound to Hooper was "very rapidly fatal" and would cause immediate or almost immediate incapacitation. Again, the matter of the victims' consciousness and awareness are matters of mere speculation.
Because we find that the prosecution failed to establish that either Hooper or Clark was aware of any suffering after being shot, we need not and cannot address whether the time of suffering was enough to permit appreciable suffering.
 C.
A third factor that is considered especially indicative of "especially heinous, atrocious or cruel" is the infliction of psychological torture. Psychological torture can be inflicted by "leaving the victim in his last moments aware of, but helpless to *Page 860 
prevent, impending death." Fleming, supra § 2[b], at 492-93. "Thus, mental suffering may be found where a victim witnesses the murder of another (particularly a family member) and then realizes that soon he or she will also be killed, as well as where the victim is expressly taunted with the prospect of his or her own death." Id. at § 2[b], at 493 (footnotes omitted).
Alabama courts have recognized that the psychological torture inflicted by a victim's witnessing the death of a family member can be a factor making his subsequent death especially heinous, atrocious, or cruel. See, e.g., Ex parte Ford, 515 So.2d at 52 (in determining that evidence established that a murder committed during a burglary was especially heinous, atrocious, or cruel, the Court noted, among other circumstances, that the 74-year-old victim "watched helplessly as Ford killed her daughter . . . [and] then turned on [her], killing her in much the same fashion"); Bui v. State, 551 So.2d 1094, 1109 (Ala.Cr.App. 1988) (in finding that the evidence supported the trial court's finding that the multiple murders of three siblings by their father were especially heinous, atrocious, or cruel, the court noted, "One can only imagine the torture each child experienced by watching their father methodically cut the throats of each of them in the presence of the others and to allow them to slowly and painfully bleed to death."), aff'd, 551 So.2d 1125 (Ala. 1989), vacated on other ground, 499 U.S. 971 (1991); Godbolt v. State,546 So.2d 982, 991 (Ala.Cr.App. 1986) (the trial court, in support of its finding that the robbery-murder was especially heinous, atrocious, or cruel, noted that one of a "combination of factors [that] sets this capital felony apart from other intentional killings" was that the victim "witnessed the killing of his wife immediately prior to his demise"), remanded on other ground, 546 So.2d 991 (Ala. 1987). Cf. Price v. State,725 So.2d 1003 (Ala.Cr.App. 1997) (in finding the evidence sufficient, the court noted that "[the robbery-murder victim] also apparently witnessed the attack on [his wife] or the results of that attack"); Woodall v. State,730 So.2d 666 (Ala.Cr.App. 1997) (in finding the evidence sufficient, the court noted that the 81-year-old victim in a murder for hire watched helplessly as the defendant shot the victim's youngest son).
In the case before us, the prosecution presented no evidence that any relationship between two or more of the victims was remotely comparable to the relationship between family members. Thus, we review the evidence for indications that the victims were in intense fear and were aware of, but helpless to prevent, impending death. "[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel." Ex parte Rieber,663 So.2d 999, 1003 (Ala.), cert. denied, 516 U.S. 995 (1995).
 "[G]enerally reasoning that the victims were already fearful for their lives when the fatal injuries were inflicted . . ., the courts in many cases have held the proof sufficient to establish as a statutory aggravating circumstance that the murder was especially heinous, cruel, depraved, or the like, even though the victim lost consciousness or died from gunshot . . . wounds instantly, within a few seconds or minutes, or otherwise without a time lapse deemed significant by the court, and without suffering other physical injury."
Fleming, supra § 2[a], at 489-90. As with the first two factors discussed (repeated infliction of injuries and appreciable suffering after a swift assault), we find that the *Page 861 
factor of psychological torture must have been present for an appreciable lapse of time, sufficient enough to have caused prolonged or appreciable suffering, i.e., the period of suffering must be prolonged enough to separate the crime from "ordinary" murders for which the death penalty is not appropriate.
The evidence before us supports only the conclusion that at least the first three shots were sudden, without any warning or precipitating event.[9] There was nothing preceding the first murder that would have evoked in the victims intense apprehension, fear, or anticipation of their deaths. Thus, we find that nothing preceding the first shot would support a finding that the offense was especially heinous, atrocious, or cruel. See Clark v. State, 443 So.2d at 977 (after recognizing that "the helpless anticipation of impending death may serve as the basis for this aggravating factor," the court found that the circumstance was not present in that case because "there is no evidence to prove that [the victim] knew for more than an instant before she was shot what was about to happen to her"). Compare Ex parte Whisenhant, 555 So.2d 235, 244 (Ala. 1989) (the trial court, in support of its finding that the rape-murder was especially heinous, atrocious, or cruel, stated that "[the victim] had reason to know that she was going to die long before the Defendant actually killed her"), cert. denied, 496 U.S. 943
(1990); Henderson v. State, 463 So.2d 196, 201 (Fla.) (in response to the appellant's claim that the multiple homicide was not especially heinous, atrocious, or cruel because the victims died instantly from single gunshots to their heads, the court noted that "[t]his argument overlooks the fact that the victims were previously bound and gagged" and that the victims "could see what was happening and obviously experienced extreme fear and panic while anticipating their fate"), cert. denied, 473 U.S. 916
(1985).
We can further conclude from the evidence that at least the first three shots were in rapid, uninterrupted succession. In addition to stating that "[i]t happened so quick," (R. 1922), codefendant Carrier testified as follows:
"Q. . . . [H]ow quick were those shots?
 "A. Well, the first one. And then he stepped up in the booth. And, I mean, it all seemed like it happened real quick.
"Q. Was it like pow, pow, pow? Or pow (pause) pow, pow?
 "A. Well, the first one and then, you know, there's a little hesitant (sic) when he had stepped up in the booth and grabbed the guy's arm and shot him. And then he just reached over and shot the other guy.
 "Q. Did any of the three victims have a chance to say anything?
"A. No. He was, like, standing over them."
(R. 1977-78.) Henson testified, "I seen [Hooper] go forward. I turned to get my gun. And when I came back around, [Herbert] was in the floor. [Clark] was laid back with his head back." (R. 974.) In addition, he answered affirmatively to the questions, "It probably happened just like that?" (R. 946) and "And you're telling this jury that this is the man that you claim you just saw kill three people in the *Page 862 
blink of an eye right here in this booth; right?" (R. 1048.)
The shootings were so quick that it would not have been necessarily evident from Norris's shooting the first victim(s) that he was going to shoot again. Moreover, even had the latter two victims experienced the horror of watching the other(s) being shot with a sense of awareness of impending death, their psychological torture would have been only momentary: they were shot almost as soon as they became aware of any danger. There is no evidence whatsoever that the latter two victims apprehended certain death more than moments before they either died or lost consciousness. And, the majority of capital murder victims experience momentary horror. However, the especially heinous, atrocious, or cruel circumstance must be especially horrific, so as to elevate the offense above the "ordinary" capital offense. We thus conclude that, because the three victims were shot in rapid, uninterrupted succession, any momentary fear or anxiety of impending death did not last sufficiently long as to constitute the unnecessary torture required to elevate the offense to an especially heinous, atrocious, or cruel offense. See Phillips v. State, 250 Ga. 336, 297 S.E.2d 217, 221 (1982) ("We refuse to hold that the mere apprehension of death, immediately before the fatal wounds are inflicted, amounts to serious psychological abuse prior to death.") (emphasis added). See, e.g., Craig v. State, 510 So.2d 857, 868 (Fla. 1987), cert. denied,484 U.S. 1020 (1988) (this aggravating circumstance was not established because "the murders were carried out quickly by shooting").
Finally, we note that the only evidence that a victim was taunted with the prospect of his own death was the testimony that Norris told Herbert to "take it like a man." However, again, we are compelled, by the lack of evidence to the contrary, to find that there was no appreciable length of time between this statement and Norris's shooting of Herbert to support the conclusion that Herbert was tortured unnecessarily. See also McCray v. State, 416 So.2d 804 (Fla. 1982) ("especially heinous, atrocious, or cruel" aggravating circumstance was not established by evidence that the appellant approached the vehicle in which the victim was sitting; yelled, "This is for you, mother fucker"; and shot the victim three times in the abdomen) (emphasis in original).
 Conclusion
In conclusion, we are compelled to hold that the capital offense committed by Norris does not fall within the definition of "especially heinous, atrocious, or cruel." In addition to our analysis above, we have dutifully considered the Alabama Supreme Court's finding in Ex parte Kyzer, upon the following facts, that although the multiple killings were certainly atrocious in the sense that three innocent victims were murdered, they were not significantly more atrocious than any other intentional homicide: evidence that the defendant, who had been charged with assaulting his ex-wife and destroying some private property belonging to her mother, entered his former mother-in-law's home, shot his ex-wife through the heart as she was attempting to flee the house with her 6-year-old son, fatally shot her mother in the head at close range, and, after wounding a man who was in the house in the shoulder, fatally shot him through the top of his head. See Kyzer v. State, 399 So.2d 317 (Ala.Cr.App. 1979).
We are mindful of the following mandate in Ex parte Clark, 443 So.2d at 973:
 "We cannot depart from the established meaning of the words enacted by the Legislature — `especially heinous, atrocious or cruel' — and apply those *Page 863 
words to include murders that do not involve the infliction of torture on the victim. Such a departure would abandon the essential characteristic that made our previous applications of § 13A-5-49(8) compatible with the Eighth Amendment. We are bound to retain the interpretation of `especially heinous, atrocious or cruel' that has provided a consistent and principled distinction between those murders for which the death sentence is appropriate and those for which it is not. See Cartwright, 486 U.S. at 363; Godfrey, 446 U.S. at 433.
 "We agree that this murder, like all murders, is a terrible crime; nevertheless, given our consistently applied narrow interpretation of the phrase `especially heinous, atrocious [or] cruel,' we cannot hold that this murder was, in comparison, `especially heinous, atrocious [or] cruel.'
"Conclusion
 ". . . [T]he principles established by the federal courts mandate that we reverse as to the sentence and remand this case for the Court of Criminal Appeals to direct the trial court to reconsider all aggravating and mitigating circumstances, excluding the aggravating circumstance set out in § 13A-5-49(8), in determining whether the death sentence is appropriate in this case."
443 So.2d at 973 (footnote omitted).
As reprehensible as Norris's actions appear, the evidence is insufficient to satisfy the prosecution's burden of proving beyond a reasonable doubt that Norris's acts meet the legal definition of "especially heinous, atrocious, or cruel" in the context of our death penalty statutory scheme, i.e., that they were conscienceless or pitiless homicides that were unnecessarily torturous to the victims. See Godfrey v. Gregg, 446 U.S. 420,428-29 (1980) (ordinary sensibility is not sufficient to provide necessary guidance). By using the word "especially," the Legislature indicated its intent that the finding of this circumstance must be based on conditions that exceed those normally present in any capital offense. Under this construction, this circumstance cannot become a "catchall" provision to be applied where there is no evidence of other aggravating circumstances. The evidence before us presents nothing from which we can draw reasonable inferences, only speculation. We have no choice but to vacate the trial court's imposition of the death penalty and remand the case for resentencing before the trial court without consideration of the aggravating circumstance that the murders were especially heinous, atrocious, or cruel compared to other capital offenses. (We need not remand for reconsideration of sentence recommendation by a jury: the jury in this instance sentenced Norris to life imprisonment without the possibility of parole.)
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
REMANDED FOR RESENTENCING.*
McMillan and Cobb, JJ., concur; Fry, J., concurs specially; Baschab, J., dissents with opinion; and Long, P.J., joins in the dissent.
* Note from the reporter of decisions: On April 28, 2000, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On June 30, 2000, that court denied rehearing, without opinion. On March 16, 2001, the Supreme Court denied certiorari review, without opinion (1991956).
[1] At the sentencing phase before the jury, defense counsel informed the jury that Norris had asked him not to plead for his life, explaining that while Norris disagreed with the jury's guilty verdict, he would rather die in the electric chair than spend the rest of his life in prison without the possibility of parole. Defense counsel, in asking the jury to recommend a sentence of death in accordance with his client's wishes, did not offer any mitigating evidence, but he did contest the sufficiency of the prosecution's evidence by way of legal argument. However, at the sentencing phase before the trial court, Norris reversed his position and asked that he be sentenced to life imprisonment without the possibility of parole.
[2] At sentencing, defense counsel argued that for the past 20 years, Norris had not been involved in any violent activity and that he is disabled from injuries sustained in a motorcycle accident. Norris's mother testified that she and Norris's father were divorced when Norris was 5 years old; that Norris had no contact with his father after the divorce; that when Norris was 16, he left home and went to Chicago to see his father; that she lost contact with Norris from that time until he was imprisoned on the 1974 murder conviction; that she knew of no violence committed by Norris after he was released from prison; that Norris's present wife is in a coma as a result of a traffic accident; that before his accident, he had gotten out of a motorcycle club; and that she thought Norris was innocent. Norris's brother testified that during the period of Norris's life when he committed the 1974 murder, he associated only with gang members because he had no adult supervision and was living in a "pretty rough area"; that in later years, Norris had matured and had exhibited no violent behavior; that "[a]ll I've ever seen [Norris] do is help people"; that Norris had a good marriage; that he believed Norris was innocent; and that his family will be involved with him while he is imprisoned.
[3] We decline to address the guilt phase at this time. The question whether the death penalty is appropriate is a much closer question when the aggravating circumstance of §13A-5-49(8) is excluded from consideration. Because it is the sentence that dictates our standard of review of the conviction, Ala.R.App.P. 45A, we will await the trial court's resentencing before conducting that review.
[4] In a joint trial, Carrier was acquitted.
[5] In Berard v. State, 486 So.2d 458, 472 (Ala.Cr.App. 1984), rev'd on other ground, 486 So.2d 476 (Ala. 1985), the trial court found, in partial support of its finding that the murders were especially heinous, atrocious, or cruel, that the offense was "especially atrocious inasmuch as it was senseless and committed for no apparent reason." In expressing concern over this reason for finding this aggravating circumstance, Presiding Judge Bowen, in an opinion in which he concurred in the result only, stated:
 "The fact that a killing is `unnecessary' cannot be used as an aggravating circumstance, Lewis v. State, 380 So.2d 970, 971 (Ala.Cr.App. 1979). `In the sense that all killings are "unnecessary", that term hardly defines the term "especially heinous, atrocious and cruel.". . . That the killing was "unnecessary" can likewise not be used as an aggravating circumstance as it is not listed as such in § 13-11-6.' Colley v. State, 405 So.2d 374, 389 (Ala.Cr.App. 1979), reversed on other grounds, 405 So.2d 391 (Ala. 1981)."
[6] See Hargrave v. Wainwright, 804 F.2d 1182, 1195 (11th Cir. 1986) (noting that "[a]n execution-style murder, as defined by the Florida courts, is typically one in which the defendant, without provocation, first renders his victim helpless — for example, by wounding the victim, tying the victim's hands, or ordering the victim to the floor — and then shoots the victim in the head at close range, often to eliminate the victim as a future witness"). We concur with the above stated characteristics of this type of killing.
[7] In noting that the prosecution must prove that the victim consciously suffered before death, one court has set out types of evidence that will satisfy or not satisfy this burden:
 "Prosecutors have satisfied this requirement by relying on evidence that the victim suffered numerous defensive wounds indicating that the victim was conscious and attempted to fight off her attacker; statements from the defendant indicating the victim consciously suffered serious physical abuse or extreme mental cruelty prior to death; witness testimony that [the] victim was alive and conscious at the time the physical abuse was inflicted; or medical evidence that the victim was conscious during the infliction of serious physical injury. In contrast, the heinous, atrocious or cruel aggravating circumstance cannot be sustained where the evidence will not support a finding of conscious physical suffering or extreme mental suffering. For instance, this Court has found the evidence insufficient to support this aggravating circumstance where there was evidence that death was instantaneous, where the evidence failed to establish which gunshot wound was fatal, or where the evidence readily supported the conclusion that the victim was rendered unconscious prior to the infliction of serious physical injury or mental torture."
Perry v. State, 893 P.2d 521, 534 (Okla.Crim.App. 1995) (footnotes omitted).
[8] In so noting, we assume that, in order for the especially heinous, atrocious, or cruel circumstance to be founded on prolonged suffering because the victim survived the assault(s) for a time, the victim must have been conscious or aware, at least sometime, of the pain and suffering inflicted.
[9] We need address only any possible psychological torture experienced by Hooper and Clark before being shot and by Herbert before being shot the first time; as noted above, there was no evidence indicating that any of the victims was conscious and aware at any time after those first three shots. *Page 864