*1210
 
 COBB, Judge.
 

 Donald Deardorff was charged in a 23-count indictment with capital murder and related offenses surrounding the death of Ted Turner. A jury convicted Deardorff of three counts of capital murder, seven counts of theft, and one count of receiving stolen property. Following a penalty-phase hearing on the capital-murder convictions, the jury recommended, by a 10-2 vote, the imposition of the death penalty. The trial court conducted a separate hearing and considered additional evidence, then ordered that the death penalty be imposed for the capital-murder convictions. The trial court imposed sentences of imprisonment for each of the remaining convictions. Deardorff appeals from the convictions and sentences for capital murder. We affirm in part and remand for further proceedings.
 

 Deardorff was initially indicted for four counts of capital murder: murder committed during the course of a burglary, § 13A-5-40(a)(4), Ala.Code 1975; murder committed during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975; murder committed during the course of a kidnapping, § 13A-5-40(a)(1), Ala.Code 1975; and murder committed for pecuniary gain or for hire, § 13A-5-40(a)(7), Ala.Code 1975. He was also charged with five counts of theft of funds from Turner’s bank and credit-card accounts, and with two counts of theft for stealing Turner’s car and truck, § 13A-8-3(a), Ala.Code 1975. Deardorff was also charged with one count of receiving stolen property, § 13A-8-17, Ala.Code 1975, for obtaining possession of a gun that had belonged to a relative of Deardorffs but was stolen in a burglary. In addition to each of the substantive charges of theft and capital murder, Deardorff was charged with 11 separate counts of conspiracy for conspiring with codefendant Millard Peacock to commit each of the eleven underlying capital-murder and theft offenses. § 13A-4-3, Ala.Code 1975. The two counts related to the charge of murder for pecuniary gain— the capital-murder charge and the conspiracy charge — were dismissed on motion of the State before trial. The State withdrew the remaining counts charging conspiracy at the conclusion of the State’s presentation of the evidence at the guilt phase.
 

 The jury found Deardorff guilty of the eleven counts submitted for its consideration — three counts of capital murder, seven counts of theft, and one count of receiving stolen property — and the trial court entered judgment and sentence on all counts. As to the non-capital convictions, the trial court imposed sentences of imprisonment totaling 140 years. In a very thorough sentencing order, the circuit judge found the following aggravating circumstances to exist: § 13A-5-49(4), Ala. Code 1975, that the capital offense was committed during the course of a robbery, a burglary, and a kidnapping; and § 13A-5-49(8), Ala.Code 1975, that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. The court found no statutory mitigating circumstances. § 13A-5-51, Ala. Code 1975. With regard to nonstatutory mitigating circumstances, § 13A-5-52, Ala. Code 1975, the trial court stated that it considered Deardorffs family life, “his past life experiences and his past service in the military,” and Deardorffs continuing assertions of innocence. (C. 29.) The court determined that the aggravating circumstances outweighed the mitigating circumstances and imposed the death sentence for each of the remaining counts of capital murder.
 

 Facts
 

 Ted Turner was a minister of Unity Church, the father of two children, and a businessman who owned a warehouse and
 
 *1211
 
 rental properties. He disappeared in September 1999. His decomposed remains were discovered in a remote area of Baldwin County in July 2001, after Deardorff s codefendant, Millard Peacock, cooperated with members of law enforcement investigating Turner’s disappearance and led them to the body.
 

 The trial of this ease spanned two weeks and involved many witnesses and exhibits. The evidence occasionally conflicted, but the evidence presented at trial tended to establish the following. Turner was 56 years old and had undergone knee surgery shortly before he disappeared in September 1999. He was still required to wear a knee brace and his mobility was restricted, but he could walk and drive a vehicle.
 

 Beginning in 1998, Turner had leased a storage warehouse to Deardorff and his girlfriend, Christy Andrews. Deardorff had, at some point, stopped making the rental payments for the warehouse and Turner pursued legal action against Dear-dorff and Andrews in the district court. Deardorff and Andrews were evicted from the warehouse and, on July 27, 1999, a default judgment was entered against them in the amount of $3,087.50. Numerous dismantled vehicles, vehicle parts, and tools were left in the warehouse when Deardorff and Andrews abandoned it, and Turner was attempting to seize those items through the court proceedings.
 

 Turner had executed a will on January 22, 1999, in preparation for a trip to Paris, France. A copy of the will was found on his kitchen table after he disappeared. The will had an addendum in Turner’s handwriting that stated: “Reaffirmed 7/27/99 just in case Don Deardorff is really crazy.” Turner’s signature followed the reaffirmation. (C. 845.)
 

 Deardorff became acquainted with his codefendant, Millard Peacock, several years before the murder, and they became friends and worked on cars together. Peacock entered into a plea bargain with the State of Alabama in which he received a sentence of 15 years’ imprisonment; part of the agreement involved Peacock’s promise to cooperate with the prosecution and to testify truthfully at Deardorffs trial. Peacock testified that Deardorff was very angry at Turner for filing the legal actions against him and attempting to seize his property. In August 1999, Deardorff told Peacock that he planned to rob Turner to “get even” with him. Deardorff also said that he would like to kill Turner.
 

 On September 20, 1999, Deardorff drove to Lucedale, Mississippi, where Peacock was staying with his girlfriend, Dawn Dun-away. Dunaway later testified that she left Peacock a note with a picture of a handgun because her .38 Special handgun was missing from her house. During the evening of September 21, 1999, Deardorff and Peacock went to an area near Turner’s house. They climbed the hillside behind Turner’s house and planned how they would later break into the house. Dear-dorff had carried a .38 caliber handgun with him, and he hid the gun behind Turner’s house before they left. Deardorff had previously told Peacock that that handgun had been stolen from his grandmother’s house during a burglary and that he later found the gun and kept it without reporting that it had been recovered. On the evening of September 22, 1999, Dear-dorff and Peacock again climbed the hillside behind Turner’s house, this time with the intent to rob Turner, Peacock said. Deardorff retrieved the handgun that he had hidden earlier, and they entered the house through an unlocked back door. Turner was not home. Deardorff looked in Turner’s file cabinets, and then the men waited for Turner to come home.
 

 When Turner entered through the front door of his house, Deardorff pointed the
 
 *1212
 
 gun at him and told him to be quiet or “he would blow his brains out.” (R.2098.) Deardorff and Peacock then used duct tape they had found in the house to bind Turner's hands, and they placed him in a closet. Deardorff left for the evening and Peacock slept on the floor. He let Turner out of the closet to use the bathroom; he removed the tape from Turner’s hands and did not reapply it when he put Turner back into the closet. Deardorff returned to the house the following morning. Peacock testified that Deardorff forced Turner to write a personal check for $4,000. Peacock said that Deardorff told Turner that “he figured this was the best way to get even with him, to leave him financially broke.” (R. 2101.) Turner told Deardorff he would give him whatever he wanted, and pleaded to be left alive. Deardorff then told Turner that he was not going to kill him. He also told Peacock that the two of them would leave the country after they had finished with Turner.
 

 Peacock drove Turner’s car to AmSouth Bank, taking the $4,000 check with him. Peacock said that he took the check to be cashed because Deardorff did not have any identification. Peacock cashed the check, returned to Turner’s house, and gave Deardorff the money. Peacock said that Deardorff then made Turner write out four “credit card checks.” The four checks totaled $17,750. Peacock again drove Turner’s car, this time to United Bank, where Peacock had an account. The bank would not cash the checks; the teller told Peacock he would have to deposit them into his savings account and that the money would be available in five business days. Peacock deposited the checks in his account. When he returned to Turner’s residence and told Deardorff that he could not access the money for five days, Deardorff said that they would have to change their plans.
 

 Deardorff and Peacock spent that remainder of the day and night in Turner’s house. They watched television and ate pizza purchased with Turner’s money. Deardorff used Turner’s computer; he ordered numerous automobile parts using Turner’s credit cards, and he visited several pornographic Web sites. Turner remained in the closet the entire time.
 

 Early the following morning, before dawn, Deardorff woke Peacock and told him they had to leave. Deardorff told Turner that they were going to take him to a park and leave him on a park bench, then call the police so they could pick him up. Turner requested a blanket because it was cool outside, so one of the men put a blanket in the car. Turner’s hands and mouth were taped using the duct tape and he was placed in the passenger seat of his own car. Deardorff took some items from Turner’s garage and some files from the file cabinet. Deardorff had the handgun and the proceeds from the check they had been able to cash. Deardorff drove the car with Turner in the front seat and Peacock followed, driving Turner’s truck.
 

 Deardorff stopped at a small gasoline service station and told Peacock to lock Turner’s truck and leave it there. Peacock then got in the backseat of Turner’s car. Deardorff told Turner that he did not want him to see where they were taking him, so he put a pillowcase over his head and taped it so it would not come off. Deardorff then placed the passenger seat in a reclining position and drove to a logging road blocked by a gate. The road was approximately one mile away from a house Deardorff and his girlfriend, Christy Andrews, had lived in until August 1999. Peacock said that he and Deardorff got Turner out of the car and walked him to the end of the logging road. Peacock did not believe at that time that Turner would be killed, and he did not know whether
 
 *1213
 
 Deardorff had a weapon with him. When they reached the end of the road, Peacock said, Deardorff told him to wait there and that he was going to walk Turner a few more feet. Deardorff walked a bit further with Turner, forcéd him to kneel on the ground, and then shot him in the head four times, killing him.
 

 Peacock and Deardorff drove Turner’s car to the service station where they had parked Turner’s truck. Deardorff suggested that he and Peacock drive the vehicles to Dawn Dunaway’s house in Mississippi and leave one of the vehicles there. Deardorff drove the car and Peacock drove the truck, and they left the truck in Mississippi. They spent two nights at a hotel in Mobile. Deardorff then instructed Peacock to drop him off at a Conoco brand gasoline service station and to pick him up there two days later, which Peacock did. The men then returned to Dunaway’s house and stayed there overnight. Dear-dorff used the computer at Dunaway’s residence to order additional car parts using Turner’s credit cards.
 

 On September 30, 1999, Deardorff drove Turner’s car to a sandbar along a river in Mississippi and burned it. Deardorff and Peacock then drove to Atmore, where Peacock entered the United Bank and withdrew from his account $17,700 from the deposit of Turner’s credit-card checks. Deardorff told Peacock to drop him off at the Conoco station. He gave Peacock several hundred dollars but told him that he would keep the rest of the money. He told Peacock that he would contact him later and that they would split the rest of the money then.
 

 Deardorff went to stay with his girlfriend at her parents’ residence. Dear-dorff told Andrews that he had gotten the money in a drug deal. He also showed her a handgun and he told her he had it for protection. On the following day, October 1, 1999, Andrews and Deardorff went to a Wal-Mart discount store in Andrews’s car. As they were leaving the store parking lot, several law-enforcement officers, with guns drawn, stopped the car. Andrews was driving. The officers asked Andrews to follow them to the sheriffs office and she agreed to do so. While en route, Andrews told Deardorff that the officers must have found out about his drug deal. Deardorff disagreed and told Andrews that they wanted to question him about Turner. Andrews said that, earlier that day, she and her father had heard a news report of Turner’s disappearance. Dear-dorff had asked them what information had been reported, and Andrews testified that Deardorff seemed surprised to hear that Turner was missing.
 

 Upon their arrival at the sheriffs office, Andrews consented to the search of her vehicle. On the backseat of her car officers discovered a box that belonged to Deardorff. Inside the box the police found $18,900 in cash and a .38 caliber handgun with five unspent rounds in the chamber.
 
 [1]
 
 The box also contained a catalog of pornographic videotapes and paperwork relating to Internet orders for automobile parts placed in Turner’s name and using his credit cards. The parts ordered were for cars of the same make and model as Dear-dorff owned and the documents were printed on the evening of September 28, 1999. When Deardorff heard the officers talking about the money and the weapon being found in the car, he stated, “The gig is up.” (R. 1514, 1595.)
 
 [2]
 
 When one of the
 
 *1214
 
 deputy sheriffs asked Deardorff what he meant by that remark, the officer testified that he replied, “[T]ake the death penalty off the table and I’ll tell you.” (R. 1595.)
 

 Deardorff then told the officers that, a few days earlier, Peacock had given him the box to hold for safekeeping. He said that Peacock asked him to hold the box for two days and that Peacock would then retrieve it. Deardorff said that he became curious about the contents of the box and opened it; he said he was surprised to see the gun and the money, and he became scared and nervous. Deardorff told the officers that when he heard that Turner was missing, he “put two and two together; the money, Millard Peacock, the gun, Ted Turner missing,” and put the box and its contents into Andrews’s car. (R. 1561.) He said that he and Andrews rode around looking for Peacock so they could return the box to him. They stopped at a Wal-Mart, he said, and were then stopped by the police. The officers noted that the box was from a Dollar General Store, and that Andrews worked in a Dollar General Store. Deardorff was arrested on a charge of possessing a firearm without a permit.
 

 Andrews consented to the search of the storage facility she and Deardorff had rented. Inside the facility the police found numerous items that came from Turner’s house, including a roll of duct tape, the ends of which matched the tape used to bind Turner’s hands and feet and to secure the pillowcase over his head, a pair of binoculars Turner frequently used at his house, and two cameras that a neighbor had recently loaned to Turner.
 

 Peacock was arrested at Dunaway’s house in Mississippi on October 5, 1999. He gave numerous conflicting statements to the police, and in July 2001, he agreed to cooperate fully and he led the police to Turner’s remains.
 

 I.
 

 Because the death penalty has been imposed in this case, this Court conducts a review of the record for plain error pursuant to Rule 45A, Ala. R.App. P. We have explained our plain-error review as follows:
 

 “Rule 45A, Ala. R.App. P., provides:
 

 “ ‘In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.’
 

 “Plain error has been defined as error so obvious that the failure to notice it would seriously affect the fairness or the integrity of judicial proceedings. Plain-error review of an alleged error must be conducted within the context of the entire proceeding.
 
 E.g., Turner v. State,
 
 924 So.2d 737, 767 (Ala.Crim.App.2002). Alabama courts have often stated that a defendant’s failure to object to an alleged error at trial weighs against any claim of prejudice raised on appeal.
 
 E.g., Ziegler v. State,
 
 886 So.2d 127 (Ala.Crim.App.2003),
 
 Ex parte Kennedy,
 
 472 So.2d 1106, 1111 (Ala.1985). Lastly, the United States Supreme Court has often stated that a criminal defendant is constitutionally entitled to a fair trial, not to a perfect one.
 
 E.g., United States v. Hasting,
 
 461 U.S. 499 (1983);
 
 Delaware v. Van Arsdall,
 
 475 U.S. 673 (1986).”
 

 Yeomans v. State,
 
 898 So.2d 878, 889 (Ala.Crim.App.2004).
 

 The attorney initially appointed to represent Deardorff on appeal filed a brief
 
 *1215
 
 addressing only penalty-phase issues. After oral argument was heard in this case, new counsel was appointed for Deardorff, and the newly appointed attorney filed a supplemental brief addressing guilt-phase issues. We will address the guilt-phase issues and then the penalty-phase issues presented in the briefs.
 

 Guilt-phase Issues
 

 II.
 

 Deardorff argues that his right to be free of double jeopardy was violated when he was convicted and sentenced for robbery-murder and also for the underlying thefts that constituted an element of the capital-murder charges. The State agrees that Deardorff was erroneously convicted of the lesser-included offenses of theft in Counts 9, 11, 13, 15, 17, 19, and 21. We agree that Deardorffs double-jeopardy rights have been violated in this respect and that the case must be remanded.
 

 The Double Jeopardy Clause provides that no person shall “be subject for the same offence to be twice put in jeopardy of life or limb.” United States Const., Amend. V. We recently addressed this issue in another case:
 

 “The crimes of robbery and theft are included in the greater offense of murder during a robbery. Rape is included in the greater offense of murder during a rape. A defendant cannot be convicted of both a greater offense and a lesser-included offense based on the same set of facts.
 
 Simmons v. State,
 
 797 So.2d 1134 (Ala.Crim.App.2000), cert. denied, 797 So.2d 1186 (Ala.), cert. denied, 534 U.S. 932, 122 S.Ct. 298 (2001).”
 

 Turner v. State,
 
 924 So.2d 737, 779-80 (Ala.Crim.App.2002),
 
 opinion on first return to remand,
 
 924 So.2d 793 (Ala.Crim.App.2003), aff
 
 'd on second return to remand,
 
 924 So.2d 796 (Ala.Crim.App.2003).
 

 Therefore, this case is due to be remanded for the trial court to vacate Dear-dorffs convictions and sentences for theft in Counts 9, 11, 13, 15, 17, 19, and 21.
 
 [3]
 

 III.
 

 Deardorff next argues that hearsay evidence was erroneously admitted during the prosecution’s case-in-chief. Specifically, he claims that State’s Exhibit 2, Turner’s will with the handwritten reaffirmation referring to Deardorff, and the testimony about the will should not have been admitted. He also argues that State’s Exhibit 52, a note Peacock wrote to Dawn Dunaway regarding his going out of town to work with Deardorff, was improperly admitted as a statement made in furtherance of a conspiracy. We disagree.
 

 A.
 
 Turner’s Will
 

 Gail Goodwin, Turner’s girlfriend, identified State’s Exhibit 2 as Turner’s handwritten will, which she signed as a witness on January 22, 1999. Goodwin identified the additional writing at the bottom of the will as also being in Turner’s handwriting. She testified about the contents of the original will, but did not testify as to the
 
 *1216
 
 substance of the addendum. Karen Hodge, Turner’s daughter, testified that she found the will after her father disappeared. She testified that, at the bottom of the will, her father had written “that he reaffirmed the will just in case Don Dear-dorff was crazy.” (R. 1237.) Greg Hodge, Turner’s son-in-law, testified that he saw the addendum to Turner’s will. He said that the addendum, in addition to other circumstances, caused him to suspect that Deardorff was involved in Turner’s disappearance. Tom Montgomery, a special agent with the Federal Bureau of Investigation (“the FBI”), testified that Turner’s daughter told him that she had found her father’s will and that the addendum to the will referred to Deardorff. Deardorff argues that this evidence was referred to throughout the trial, and was prejudicial. He also notes that part of the prosecution’s theory was that Deardorff killed Turner, in part, because of the civil case Turner had filed against him. Deardorff objected to none of the foregoing testimony about Turner’s will. Therefore, we review his claim for plain error.
 

 Alabama courts have often stated that a determination of the admissibility of evidence rests in the trial court’s sound discretion and that the trial court’s ruling will not be reversed absent an abuse of that discretion.
 
 E.g., Baird v. State,
 
 849 So.2d 223, 237 (Ala.Crim.App.2002). Rule 801(c), Ala. R. Evid., defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” A statement offered for a reason other than
 
 to
 
 establish the truth of the matter asserted therein is not hearsay.
 
 E.g., Smith v. State,
 
 795 So.2d 788, 814 (Ala.Crim.App.2000).
 

 Gail Goodwin testified that she had witnessed the original will, and she identified Turner’s handwriting on the original portion and on the addendum. Goodwin did not testify as to the contents of the will or to the reference to Deardorff. Clearly, Goodwin’s testimony was offered for the purpose of establishing that the will was Turner’s and that the addendum had been written by Turner. Thus, Goodwin’s testimony did not constitute hearsay because it was not offered to prove the truth of that matter asserted—that Deardorff killed Turner. No plain error occurred as a result of Goodwin’s testimony.
 

 Karen Hodge testified that she found the will at her father’s house. She, too, testified that the addendum to the will was in Turner's handwriting and she read for the record the text of the addendum. She stated that she took the will to the police department. Karen’s testimony was offered, not for the truth of the matter asserted—that Deardorff killed Turner— but for the purpose of establishing that the signature on the original will and the text of the addendum were in Turner’s handwriting and that the addendum verified some concerns Turner had had as a result of his legal problems with Deardorff. Her testimony was not hearsay, and it was properly admitted.
 

 Greg Hodge, Turner’s son-in-law, testified that he built Turner’s computer. After Turner disappeared, Hodge examined the computer to review recent activity on the Internet. Hodge discovered e-mail confirmations that several automobile parts had been ordered, and he determined that the types of parts ordered matched the automobiles that Deardorff had left in the warehouse he had rented from Turner. Hodge testified that the companies were contacted to confirm that the parts were ordered after Turner had disappeared. Hodge testified that he began to suspect Deardorffs involvement in Turner’s disappearance because the auto
 
 *1217
 
 mobile parts ordered matched the automobiles Deardorff had in the warehouse. The prosecutor then asked Hodge whether he had seen the addendum to Turner’s will, and Hodge said he had seen it. The prosecutor asked if that, too, caused him to suspect Deardorff, and Hodge said that it did. (R. 1292.) Hodge said that he and Karen turned the information over to law-enforcement officers.
 

 Agent Montgomery testified that in a missing-person case, a series of steps is generally followed to determine whether the person left voluntarily or as a result of foul play. He said the victim of a crime often knows the perpetrator, and he asked Turner’s daughter, Karen Hodge, whether anyone was mad at her father or had had a dispute with him. Karen advised the agent that her father had had difficulties with two tenants at his rental property; one tenant had been evicted from a mobile home, and the other tenant had been evicted from a warehouse facility from which he had run an automotive business. Further investigation revealed that Deardorff was the tenant who had been evicted from the warehouse. Agent Montgomery testified that a few days after Turner disappeared, Karen informed him that she had found her father’s will and that Deardorff was mentioned in the addendum to the will. He said that Deardorff and his girlfriend, along with the other tenant Turner had evicted from a rental property, were the initial suspects in Turner’s disappearance. Montgomery also testified that law enforcement became aware of Peacock’s name when AmSouth Bank personnel notified the Turner family that he had cashed a $4,000 check on the victim’s account. Agent Montgomery testified that he had no evidence of malice between Peacock and Turner at that time. He further testified that he learned of Peacock’s association -with Deardorff on October 1, 1999, in his interview with Deardorffs girlfriend, Christy Andrews.
 

 A review of the record demonstrates that Agent Montgomery’s testimony and Karen and Greg’s testimony about Turner’s will, and particularly the addendum to the will, was given in context of the investigation of the case and the reasons for the actions the police took. It was by definition not hearsay and it was properly admitted into evidence. We have considered cases presenting similar circumstances and have found no error in the admission of the testimony. For example, in
 
 Smith v. State,
 
 795 So.2d 788 (Ala.Crim.App.2000), a police officer testified that, during a search of the house belonging to the defendant’s mother, she told him that the defendant had put some clothes in the washing machine; Smith argued that the testimony was prejudicial hearsay. We held:
 

 “[T]his statement was elicited to establish the reasons for the officer’s action and the reasons the officers searched certain areas of the trailer. It was not offered for the truth of the matter asserted and was not hearsay. ‘The fact of the conversations in this case was offered to explain the officer’s actions and presence at the scene — not for the truth of the matter asserted. Accordingly, it was not hearsay.
 
 Clark v. City of Montgomery,
 
 497 So.2d 1140, 1142 (Ala.Cr.App.1986).’
 
 Thomas v. State,
 
 520 So.2d 223 (Ala.Cr.App.1987).”
 

 795 So.2d at 814.
 

 In
 
 D.R.H. v. State,
 
 615 So.2d 1327 (Ala.Crim.App.1993), the appellant argued that hearsay had erroneously been admitted when the officers were permitted to testify about what the confidential informant had told them. We disagreed, found that the evidence was not hearsay, and stated, “[The officers’] testimony was received to show the reasons for the officers’ actions
 
 *1218
 
 and how their investigation focused on a suspect.
 
 Sawyer v. State,
 
 598 So.2d 1035 (Ala.Cr.App.1992).” 615 So.2d at 1330.
 
 In accord, Miller v. State,
 
 687 So.2d 1281, 1285 (Ala.Crim.App.1996).
 

 The testimony about Turner’s will that was elicited from Goodwin, the Hodges, and Agent Montgomery was not hearsay and it was properly admitted at trial. No error or plain error occurred as a result of the admission of their testimony.
 

 B.
 
 Note from, Peacock
 

 Deardorff also argues that State’s Exhibit 52, a note Peacock wrote to his girlfriend, Dawn Dunaway, regarding his going out of town to work on a car with Deardorff, was improperly admitted as a statement made in furtherance of a conspiracy. He contends that because the State failed to prove that the statement was made in furtherance of the conspiracy, it constituted hearsay and therefore should not have been admitted. Deardorff objected on this basis at trial and the trial court overruled the objection; thus the alleged error was preserved for our review.
 

 Dunaway identified State’s Exhibit 52 as a note Peacock wrote to her the week before Turner was kidnapped. The note informed Dunaway that Peacock was going to Atlanta with Deardorff to work on a car. When Deardorff objected at trial on the ground that the note did not demonstrate a furtherance of the conspiracy and was, instead, offered for the truth of the matter asserted (R. 1613), the State argued that the note was not offered to establish the truth of the matter asserted — that Peacock and Deardorff went to Atlanta to work on a car. Instead, the State argued that it was offered to show that Deardorff and Peacock were traveling together and making a plan during the days before Turner was kidnapped. The State also argued that the statements of a coconspirator in furtherance of the conspiracy are admissible.
 

 Rule 801(d)(2), Ala. R. Evid, states, in pertinent part, that a statement is not hearsay if it “is offered against a party and is ... a statement by a cocon-spirator of a party during the course and in fui'therance of the conspiracy.” Dear-dorff does not dispute that there was a the conspiracy. “A coconspirator’s out-of-court statement is admissible when it is part of the res gestae. ‘Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant.’
 
 Moore v. State,
 
 539 So.2d [416,] 420 [(Ala.Crim.App.1988)].”
 
 Acklin v. State,
 
 790 So.2d 975, 999 (Ala.Crim.App.2000). The note from Peacock tended to establish that Deardorff and Peacock had formulated a plan to make it appear that they were not in Alabama at the time the crimes against Turner were to be perpetrated and to provide an alibi for them. Thus, Peacock’s statement in the note was within the res gestae of the crime, and the trial court correctly admitted the note into evidence. No error occurred with regal’d to this issue, and Deardorff is not entitled to any relief.
 

 rv.
 

 Deardorff next argues that the prosecutor improperly commented during closing argument at the guilt phase on Deardorffs failure to testify. Specifically, he objects to the statement, “He didn’t make testimony.” (R. 2790.) Deardorff did not object to this statement when the prosecutor made it, so our review is limited to a review for plain error. We find no plain error.
 

 “ ‘ “This court has concluded that the failure to object to improper prosecuto-rial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the
 
 *1219
 
 defense did not consider the comments in question to be particularly harmful.” ’
 
 Kuenzel v. State,
 
 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting
 
 Johnson v. Wainwright,
 
 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Moreover,
 

 “ ‘[t]his court has stated that “[i]n reviewing allegedly improper prose-cutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.”
 
 Bankhead v. State,
 
 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). See also
 
 Henderson v. State,
 
 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). “In judging a prosecutor’s closing argument, the standard is whether the argument ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ”
 
 Bankhead,
 
 585 So.2d at 107, quoting
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). “A prosecutor’s statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.”
 
 Roberts v. State,
 
 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2]8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, “statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.”
 
 Bankhead,
 
 585 So.2d at 106.’ ”
 

 Johnson v. State,
 
 823 So.2d 1, 45-46 (Ala.Crim.App.2001)(quoting
 
 Ferguson v. State,
 
 814 So.2d 925, 946 (Ala.Crim.App.2000)).
 

 The comment now objected to was made in the prosecution’s rebuttal closing argument during the guilt phase of the trial. During that rebuttal argument, the prosecutor addressed some of the arguments defense counsel had made in their closing arguments, and he restated his theory of the case against Deardorff. The comment was made near the middle of the prosecutor’s rebuttal argument:
 

 “What do we have on Donald Dear-dorff that points to him? You had the default judgment and you had the motive. What else do we have? Deardorff has no place to live and he’s having trouble. What else do we have? You have Ted Turner’s will naming (sic). What else do you have? I’m having a hard time reading that. Let me get my list. Here we go. Trifocals are better. You’ve got Deardorffs car at the catfish house just like they said. You’ve got Deardorffs use of Ted Turner’s computer.
 

 “Now, let me tell you, /all remember the evidence on this. This is critical, because [defense counsel] suggested to you it was 1:36. You remember the evidence that the check was 12:28 at Fairhope Bank. It’s in evidence. And when they said that computer was turned on that porno site was 12:28, the
 
 *1220
 
 exact time. And you heard from the witness stand that Tom Montgomery found a problem on that time clock, and it wasn’t 1:86, it was 1:03. That’s the evidence before this jury. It’s not 1:36 as [defense counsel] suggested. It’s 1:03.
 

 “And at Dawn’s house. Now, why do we think the same? It’s the same porn site. Now, is [defense counsel] suggesting that Mr. Peacock has killed Mr. Turner and there is somebody else in that house while he’s cashing the check, visiting a porn site that just so happened to be visited at Dawn Dunaway’s house? No. It’s not common sense and it’s not reasonable.
 

 “What other areas do you have? Connection. Again, you have the money, pistol, car part, receipt books. And I made a mistake earlier. I forgot that the computer orders, I thought it came out of the shed. It came out of the car. What came out of the shed, I think, was the tape, the masking tape, the same masking tape that was used around Ted Turner’s hands, I submit to you. The same shed that is not connected to Peacock, it’s connected to Deardorff. Mr. Peacock doesn’t have a key to it. Could not get into it.
 

 “And the gig is up. Take capital murder off the table. You heard the phone calls from the jail and to his mother.
 
 He didn’t make testimony.
 
 There ain’t no doubt about it. They’ve got the power to subpoena. They could bring anybody up here they wanted to.
 

 “We put inmates up here. You’ve got to determine whether they’re telling you the truth. But I’m going to tell you something. It’s hard for me to believe that Mr. Fambro can make up something that nobody knows. Didn’t nobody know he was killed up there around Stockton at this time. Mr. Fam-bro nails it. And he had him shot.”
 

 (R. 2788-91.)(Emphasis added.)
 

 “When an accused contends that a prosecutor has made improper comments during a closing argument, the statements at issue must be viewed in the context of the evidence presented in the case and the entire closing argument made to the jury — both defense counsel’s and the prosecutor’s.
 
 Washington v. State,
 
 259 Ala. 104, 65 So.2d 704 (1953);
 
 Stephens v. State,
 
 580 So.2d 11 (Ala.Crim.App.1990),
 
 aff'd,
 
 580 So.2d 26 (Ala.1991).”
 

 Ex parte Musgrove,
 
 638 So.2d 1360, 1368 (Ala.1993).
 

 Viewing the objected-to comment in context of all of the evidence and in context of the entire closing argument, as our caselaw directs us to do, we first note that we are unable to discern exactly what the prosecutor’s comment intended to convey. The above-quoted portion of the rebuttal argument was not cohesive. Rather, it appears that the prosecutor was responding, point-by-point and from a list, to defense counsel’s closing arguments. It further appears that the comment to which Deardorff now objects was directed to the various types of evidence the State presented regarding the statements Deardorff made while he was in jail, including the statements he made to his mother, to the police, and to other inmates. It also appears that the prosecutor was responding to defense counsel’s assertions that the inmates called by the State were not telling the truth and was making the point that, if other witnesses could have testified to different facts, Deardorff could have called them to testify. Viewing the evidence presented and the entire argument in context, we are unable to conclude with any degree of certainty that the isolated comment was,
 
 *1221
 
 in fact, a comment on the defendant’s failure to testify. It appears more likely that the comment was directed at Dear-dorffs failure to present other testimony that would have supported his defense, if those witnesses existed. Therefore, no plain error occurred.
 
 See also Ex parte Musgrove,
 
 638 So.2d 1360 (Ala.1993);
 
 Payne v. State,
 
 683 So.2d 440, 449-51 (Ala.Crim.App.1995),
 
 aff'd,
 
 683 So.2d 458 (1996).
 

 Even if the comment could be interpreted as an indirect comment on Deardorffs failure to testify, we would find no plain error. We have previously held:
 

 “ ‘Thus, in a case in which there has been only an indirect reference to a defendant’s failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness.
 
 Ex parte Yarber,
 
 375 So.2d [1231,] 1234 [ (Ala.1979) ];
 
 Ex parte Williams,
 
 [461 So.2d 852, 853 (Ala.1984) ];
 
 Ex parte Wilson,
 
 [571 So.2d 1251 (Ala.1990) ];
 
 Ex parte Purser,
 
 [607 So.2d 301 (Ala.1992) ]. A virtual identification will not exist where the prosecutor’s comments were directed toward the fact that the State’s evidence was uncontradicted, or had not been denied. See
 
 Beecher v. State,
 
 294 Ala. 674, 682, 320 So.2d 727, 734 (1975);
 
 Ex parte Williams,
 
 supra;
 
 Ex parte Purser,
 
 supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.’
 

 “Ex parte Brooks,
 
 695 So.2d 184, 188-89 (Ala.1997)(footnotes omitted).”
 

 Gavin v. State,
 
 891 So.2d 907, 981 (Ala.Crim.App.2003).
 

 The prosecutor’s comment seems to suggest, at most, that the defense failed to present testimony to contradict any of the testimony the prosecution presented that tended to establish that Deardorff was the manipulator, the one who directed Peacock’s actions, and the one who had made statements admitting his involvement in the capital murder. As the prosecutor noted in the same portion of the rebuttal argument to which Deardorff now objects, the defense could have called any witnesses it had who would contradict the prosecution’s theory of the case. The prosecutor also noted that the jury would have to determine whether the prosecution witnesses had been truthful.
 

 Remarks that refer to the failure of the defense and to the fact that the State’s evidence is uncontradicted are permitted and have been found not to violate a defendant’s constitutional right to refuse to testify. The comment was “not manifestly intended or of such a character that a jury would naturally and necessarily” take it to be a comment on Deardorffs choice not to testify.
 
 Gavin,
 
 891 So.2d at 983. Therefore, even if the comment could have been construed as an indirect comment on Dear-dorffs failure to testify, we would find that Deardorff was not entitled to relief on his claim, because no plain error would have occurred.
 

 V.
 

 Deardorff next argues that improper character evidence was admitted. Agent Charles Huggins of the Alabama Bureau of Investigations testified that he interviewed Deardorff four times during the course of the investigation of Turner’s disappearance and murder. During the first interview, after Andrews’s car was searched and the police found the money and the handgun, Deardorff explained to Agent Huggins how he came into possession of those items. Agent Huggins testified that Deardorff told him that Peacock
 
 *1222
 
 had told him the box had some personal items in it and had asked Deardorff to keep it for two days. Deardorff told Agent Huggins that, while he was walking to Andrews’s parent’s house with the box, he heard a clumping sound and became curious, so he looked inside the box. He said he became scared and nervous when he saw the money and the gun, and he hid the items when he got to the house. He showed Andrews the gun and the money, but he told her that the money came from a drug transaction and that the gun belonged to a drug dealer. Deardorff told Agent Huggins that he had not told Andrews that the money and the gun had come from Peacock because Andrews did not like him to spend time with Peacock, and she would have been angry if he had told her that they were Peacock’s. On the following day, Deardorff told Agent Huggins, he saw a news report about Turner’s disappearance and he “started putting two and two together; the money, Millard Peacock, the gun, Ted Turner missing.” (R. 1561.) Deardorff said that he put everything back into the box, which was a box from a Dollar General Store; Andrews was employed at a Dollar General Store. Deardorff told Agent Huggins that he put the box in the car and that he and Andrews drove to Bay Minette to search for Peacock so he could return the box to him. Deardorff told Agent Huggins that they were looking for Peacock when they were stopped in the Wal-Mart parking lot. The prosecutor asked Agent Huggins, without objection from the defense, if he found Deardorffs explanations credible. Agent Huggins answered, “No, sir.” (R. 1566.) Trial was then recessed for a lunch break. When the direct examination of Agent Huggins resumed, the prosecutor noted that, before the break, he had asked Agent Huggins whether he found Deardorffs statements to be credible; he asked whether Agent Huggins remembered his response to the question. Again, without an objection from the defense, Agent Huggins testified that his answer had been “no.” Agent Huggins then testified that he found Deardorffs version of events not to be credible because they conflicted with Andrews’s statements and because Dear-dorff had told him that he was riding around hoping to locate Peacock so he could return the money.
 

 Deardorff now argues that Agent Huggins should not have been permitted to testify that he did not find Deardorffs statements credible. He claims that the evidence could not have been admitted to impeach his credibility as a witness because he did not testify. He further argues that it could not have been admitted pursuant to Rule 404(a)(1), Ala. R. Evid., because he did not put forth character evidence. The State argues that the trial court did not abuse its discretion when it permitted this testimony because Agent Huggins simply gave his opinion based on facts already in evidence.
 

 We note, initially, that Deardorff did not object either time that the prosecution asked Agent Huggins for his opinion as to the credibility of Deardorffs statements. Therefore, we review this claim for plain error only, and we find no plain error. “Alabama courts have repeatedly held that the trial court has broad discretion in determining the admissibility of evidence, and that the trial court’s determination will not be reversed unless the court has abused its discretion.”
 
 Yeomans v. State,
 
 898 So.2d 878, 894 (Ala.Crim.App.2004).
 

 Agent Huggins was one of the law-enforcement officers initially involved in investigating Turner’s disappearance. During the early stages of the investigation, Deardorff was identified as a possible suspect; his name was on the addendum to
 
 *1223
 
 Turner’s will, and Turner’s daughter identified him as a person with whom Turner had had a legal dispute. When law-enforcement officers found Deardorff and he had in his possession a large sum of money and a gun, they questioned him about the items; Deardorff gave the statement to Agent Huggins. Agent Huggins’s opinion of whether Deardorffs initial statements were credible was relevant to whether the officers continued to consider Deardorff as a suspect and continued to investigate his possible involvement, or whether they believed Deardorff was telling the truth and that he was not involved in Turner’s disappearance.
 

 Rule 701, Ala. R. Evid., provides:
 

 “If the witness is not testifying as an expert, the witness’s testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness’s testimony or the determination of a fact in issue.”
 

 As a witness who was testifying not as an expert but rather as to the initial stages of the investigation and the reasons the investigation focused on Deardorff as a suspect, Agent Huggins’s opinion was permissible.
 

 Moreover, the audiotape of Dear-dorffs second interview with the police, which took place three days after the initial interview, was played for the jury. Agent Huggins testified that, during that interview, Deardorff told officers that he had lied during the first interview and that he wanted “to come clean.” (R. 1722.) Agent Huggins then identified the discrepancies between Deardorffs first statement and his second statement. Even if Huggins’s statement regarding the credibility of Deardorffs initial explanation had been error because it encroached on the jury’s right to determine the credibility of Dear-dorffs statement, it would have been rendered harmless by the subsequent admission of the audiotapes of the interviews. The jury heard Deardorff admit that he had lied during his first interview with the police.
 
 Ex parte Harris,
 
 892 So.2d 875, 878 (Ala.2004).
 

 No plain error occurred as a result of Agent Huggins’s testimony.
 

 VI.
 

 Deardorff next argues that Richard Dale Carter, the State’s forensic expert, was erroneously permitted to testify that the duct tape recovered from the victim’s body matched the roll of duct tape recovered from the warehouse unit Deardorff had rented from Turner. He acknowledges that defense counsel made no objection at trial to Carter’s testimony. We review the claim for plain error, and we find none.
 

 Carter testified as to his academic credentials and the course work he had completed at the FBI academy schools. He stated that his area of specialty is firearm and toolmark examination. After he testified about the results of his comparison of the bullets and the revolver he received in this case, he testified that he compared the duct tape found on the victim’s jacket and the pillowcase to the roll of duct tape that was recovered from Deardorffs warehouse unit. Carter explained the manufacturing process involved in making rolls of duct tape and he testified in detail about the manufacturing marks that remain on the tape. Carter stated that, in his opinion, the tape recovered from the crime scene and the roll of duct tape recovered from Deardorffs warehouse unit were all made on the same machine during the same four- to six-month period.
 

 A determination of the admissibility of evidence rests in the trial court’s sound discretion, and the trial court’s rul
 
 *1224
 
 ing will not be reversed absent an abuse of that discretion.
 
 E.g., Baird v. State,
 
 849 So.2d 223, 237 (Ala.Crim.App.2002). Rule 702, Ala. R. Evid., provides:
 

 “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
 

 In his brief to this Court, Deardorff acknowledges that the duct-tape comparison was an area beyond the understanding of an average juror. There is no dispute that Carter examined the tape from the crime scene and the roll of tape from the warehouse facility. Deardorff appears to argue that the State did not establish Carter’s qualification to render an expert opinion about the duct tape comparison. However, the Advisory Committee’s Notes to Rule 702, Ala. R. Evid., provide:
 

 “[U]nder Rule 702 'qualification’ should continue to be defined broadly, so that one may gain an expertise through practical experience as well as through formal training or education. See, e.g.,
 
 International Telecommunications Sys. v. State,
 
 359 So.2d 364 (Ala.1978) (recognizing that experience and practical knowledge, as fully as formal education, qualify one to make technical judgments).”
 

 Carter’s testimony established that he had received on-the-job training with the forensic sciences departmental director when he began his career, that he had been working as a forensic scientist for more than 30 years, and that he had completed numerous post-graduate training seminars. The proper predicate for Carter’s expert testimony regarding the duct-tape comparison was laid, and the trial court did not abuse its broad discretion when it permitted Carter to testify. No plain error occurred as a result of Carter’s testimony, and Deardorff is not entitled to any relief on this claim.
 

 VII.
 

 Deardorff next argues that the stop and search of Christy Andrews’s vehicle were illegal, as was the subsequent seizure of evidence from the vehicle. He appears to argue that he was unlawfully detained while Andrews’s consent to search was obtained. Finally, Deardorff also appears to argue that Andrews’s consent was not given voluntarily. Defense counsel filed a pretrial motion to suppress the evidence seized from the vehicle, making many of the same arguments. After a hearing, the trial court denied the motion to suppress. We need not address the trial court’s ruling on the merits of Dear-dorffs motion to suppress, however, because Deardorff had no standing to object to the stop and search of another person’s vehicle or to the seizure of evidence from that vehicle.
 

 Deardorff filed a pretrial motion to suppress; in that motion he alleged that he was detained and “his vehicle was searched” without probable cause. (C. 150.) He also alleged in that motion that Christy Andrews did not voluntarily consent to the search of the car, which he acknowledges she was driving when the officers stopped the vehicle. He alleged, last, that even if Andrews had voluntarily consented to the search of the vehicle, the evidence seized in the search was due to be suppressed because, he says, there was no reasonable basis for the search.
 

 During the hearing on the motion to suppress, the prosecutor argued that Deardorff did not have standing to object to the search and seizure. (R. 360-61.) Defense counsel argued that he could establish that Deardorff owned the car, and
 
 *1225
 
 the hearing proceeded. The State presented evidence indicating that Andrews owned the car and that she had consented to the search of the car. The State also presented evidence indicating that Andrews and Deardorff were stopped because they were wanted for questioning with regard to Turner’s disappearance. During the hearing, the trial court interjected, “Wait a minute now. I was told at the start of this hearing that Mr. Dear-dorff owned the vehicle. That’s what [defense counsel] said. Now you’re telling me that according to whatever [records check] you ran it through, that Ms. Andrews owned the vehicle?” (R. 434.) The court further stated, “At this point in time ..., there is no standing for Mr. Deardorff to raise the motion to suppress until he presents something to indicate he is an owner of the vehicle.” (R. 435.) Defense counsel claimed that his presence in the vehicle gave him standing to object to the stop and the search, and the hearing proceeded. (R. 439.) Further testimony from the employees in the probate office that had provided license tags for the vehicle also indicated that Andrews was the owner of the vehicle at the time of the stop and search.
 

 At the conclusion of the hearing on the motion to suppress, the trial court stated, “I’m not sure that Mr. Deardorff has standing to raise the issue about the suppression, but assuming that he does have standing, I still find that the State has presented sufficient evidence that the search was voluntary....” (R. 565-66.) As the trial court suggested in its ruling, we conclude that Deardorff did not establish that he had standing to object to the stop and search of the vehicle. Therefore, we affirm the trial court’s denial of the motion to suppress.
 

 The United States Supreme Court, in
 
 Rakas v. Illinois,
 
 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), addressed the issue whether a mere passenger in vehicle that was stopped and searched could object, on Fourth Amendment grounds, to the legality of the search. The Supreme Court held that the passenger-defendant did not have standing to object. The Court stated:
 

 “As we stated in
 
 Alderman v. United States,
 
 394 U.S. 165, 174 (1969), ‘Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.’ See
 
 Brown v. United States,
 
 411 U.S. 223, 230 (1973);
 
 Simmons v. United States,
 
 390 U.S. 377, 389 (1968);
 
 Wong Sun v. United States,
 
 371 U.S. 471, 492 (1963); cf.
 
 Silverman v. United States,
 
 365 U.S. 505, 511 (1961);
 
 Gouled v. United States,
 
 255 U.S. 298, 304 (1921). A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person’s premises or property has not had any of his Fourth Amendment rights infringed.
 
 Alderman, supra,
 
 394 U.S., at 174. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment,
 
 United States v. Calandra,
 
 414 U.S. 338, 347 (1974), it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule’s protections.”
 

 439 U.S. at 133-34, 99 S.Ct. 421 (footnote omitted).
 

 The Court further explained:
 

 “[T]he question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defen
 
 *1226
 
 dant which the Fourth Amendment was designed to protect.”
 

 439 U.S. at 140, 99 S.Ct. 421.
 

 “[The] petitioners’ claims must fail. They asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized. And as we have previously indicated, the fact that they were ‘legitimately on [the] premises’ in the sense that they were in the car with the permission of its owner is not determinative of whether they had a legitimate expectation of privacy in the particular areas of the automobile searched.... But here petitioners’ claim is one which would fail even in an analogous situation in a dwelling place, since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger
 
 qua
 
 passenger simply would not normally have a legitimate expectation of privacy.”
 

 439 U.S. at 148-49, 99 S.Ct. 421.
 

 Like the passengers in
 
 Rakas,
 
 Deardorff did not own the vehicle in which he was riding. The box containing the money and the gun was on the back seat of the car, and, according to
 
 Rakas,
 
 Deardorff did not have a legitimate expectation of privacy in that area. Moreover, Deardorff claimed that he did not own the box containing the money and the gun. Therefore, Deardorff did not have standing to raise any Fourth Amendment objections to the stop and search of Andrews’s vehicle or to the seizure of the box and its contents from the backseat of that vehicle.
 

 Because Deardorff did not have standing to object to the search of the vehicle and the seizure of the evidence from the vehicle, the trial court’s denial of his motion to suppress is due to be affirmed.
 

 Penalty-phase Issues
 

 VIII.
 

 Deardorff next argues that the trial court erred when it found the aggravating circumstance in § 13A-5-49(8), Ala. Code 1975, to exist. Specifically, he argues that the facts surrounding Turner’s death did not support the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses because Turner was killed by rapid gunshots to the head. Although Deardorff acknowledges that Turner was held against his will for two days, he asserts that this did not support the aggravating circumstance because “he was untied shortly after his capture, allowed to use the restroom, and supplied with blankets and jackets when he complained he was cold.” (Appellant’s initial brief at pp. 12-13.) Deardorff also states that the trial court’s mention of the fact that Turner was forced to walk an extended distance, even though he had recently had knee surgery, indicates that the trial court considered an improper factor in reaching its finding that this circumstance applied. The State notes that Deardorff did not raise this objection in the trial court so our review is limited to review for plain error. The State also argues that the facts presented at trial amply support the trial court’s finding that this crime was especially heinous, atrocious, or cruel. We agree with the State.
 

 In its sentencing order, the trial court made the following findings regarding this aggravating circumstance:
 

 “The capital offense was especially heinous, atrocious and cruel compared to other capital offenses in that the victim, Ted Turner, lived alone, was unsuspecting and unarmed when overpowered by two assailants; was held in a hall closet for over twenty-four (24) hours; was
 
 *1227
 
 removed from his home and driven in his own vehicle to a wooded area while being bound and having a pillow case taped over his head; was forced to walk an extended distance into the woods after only recently having knee surgery which limited the use of his leg, and was shot in the back of the head at least three times after complying with all of the wishes of his assailants, therefore [the §] 13A-5-49(8) [Ala.Code 1975] aggravating circumstance is present. The aggravating circumstance that has been found above is found to be present beyond a reasonable doubt, and an aggravating circumstance to be considered.”
 

 (C. 27-28.)
 

 Deardorff filed a motion to reconsider the sentence, but he did not raise this ground of objection. Therefore, we review this argument for plain error. We find no plain error in the trial court’s determination that this crime was especially heinous, atrocious, or cruel, as that aggravating circumstance has been defined in Alabama law.
 

 This Court has often stated:
 

 “ ‘When considering whether a particular capital offense was “especially heinous, atrocious or cruel,” this Court adheres to the standard set out in
 
 Ex parte Kyzer,
 
 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those “conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’”
 
 Duke v. State,
 
 [889 So.2d 1, 36 (Ala.Crim.App.2002)].”
 

 Yeomans v. State,
 
 898 So.2d 878, 905 (Ala.Crim.App.2004).
 

 “One factor this Court has considered particularly indicative that a murder is ‘especially heinous, atrocious or cruel’ is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture ‘must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.’
 
 Norris v. State,
 
 793 So.2d 847, 861 (Ala.Crim.App.1999).
 

 “In
 
 Ex parte Rieber,
 
 663 So.2d 999 (Ala.1995), the defendant stalked a convenience-store clerk for several days before he walked into the store and shot her during a robbery. There was evidence that the clerk had been aware of his presence and that she was afraid of him. This Court held that the murder was ‘especially heinous, atrocious or cruel’ given, among other things, that the murder was perpetrated under circumstances that caused fear and pain to the victim before death. The Court specifically stated that ‘evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, or cruel.
 
 Ex paHe Whisenhant,
 
 555 So.2d 235, 243-44 (Ala.1989)....’ 663 So.2d at 1003.”
 

 Ex parte Key,
 
 891 So.2d 384, 390 (Ala.2004).
 

 As the trial court stated in the sentencing order, the victim was held captive in a closet in his own home for more than 24 hours. He complied with each demand his captors made, and he never attempted to fight them or to escape. The evidence presented at trial indicated that Turner pleaded for his life while he was being held captive, agreeing to do whatever was asked of him so that he would not be killed. Turner knew that Deardorff was armed with a pistol because Deardorff had threatened to kill Turner with it when Turner arrived home and found Deardorff and Peacock inside his house waiting for him. The addendum to Turner’s will,
 
 *1228
 
 which was written on the day Turner obtained a default judgment in his case against Deardorff, indicated that Turner was afraid of what Deardorff might do to him. The trial court correctly noted that Turner had recently had knee surgery and that his mobility was limited. This condition would have added to the physical discomfort of being bound and confined in a closet. When the assailants took Turner from his house, they bound his hands and placed duct tape over his mouth. During the trip, they placed a pillowcase over his head and secured it with duet tape. They then forced Turner to walk a long way down a logging road; the trial court correctly noted that the extended walk would have been difficult for Turner, given his medical condition. Once they reached the end of the logging road, Deardorff forced Turner to kneel on the ground. He shot Turner repeatedly in the back of the head.
 

 Deardorff argues that there is a “complete lack of evidence of physical or psychological torture” in this case. (Appellant’s reply brief at p. 2.) We disagree. The evidence fully supports the trial court’s finding that the § 13A-5-49(8) aggravating circumstance applies to this case. From the moment Deardorff threatened Turner with “blowing his brains out” to the moment he was forced to kneel, bound and with his head covered with a pillowcase secured with duct tape, Turner’s fear for his life was undoubtedly great. Turner knew that Deardorff was angry and vengeful, and he knew that he was armed. The terror he experienced must have escalated tremendously when his mouth was taped and his hands were bound as he was taken away from his home, driven away in his own car. When the pillowcase was taped over his head and he could no longer see where he was being taken, he had to know that his death was imminent. This type of prolonged psychological torture has been held to support the finding of the § 13A-5-49(8) aggravating circumstance.
 
 See, e.g., Ziegler v. State,
 
 886 So.2d 127 (Ala.Crim.App.2003),
 
 sentence aff'd on return to remand,
 
 886 So.2d at 150 (Ala.Crim.App.2003)(uphold-ing finding of § 13A-5-49(8) aggravating circumstance after defendant participated in “prolonged brutal beating of the slightly built victim, and then led him down a dark road and into the wooded area where, without a doubt, [the victim] was filled with terror and the knowledge that his death was imminent”);
 
 Ex parte Whisenhant,
 
 555 So.2d 235, 243-44 (Ala.1989)(recognizing that the fear experienced by the victim before death is a significant factor in determining the existence of this aggravating circumstance).
 

 The trial court’s determination that the evidence established the § 13A-5^49(8) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, is fully supported by the record. No plain error occurred; Deardorff is not entitled to any relief on this claim.
 

 IX.
 

 Deardorff next argues that the trial court erred when it permitted the State to elicit prejudicial character evidence during the sentencing hearing before the jury. Specifically, Deardorff argues that the State should not have been permitted to introduce evidence indicating that he received a dishonorable discharge from the United States Navy following his desertion. Deardorff did not object to the prosecutor’s questions at trial, so the claim is reviewed only for plain error.
 

 Deardorff presented his mother, Laura Byrd, as a witness at the sentencing hearing before the jury. Byrd testified that when Deardorff was in the Navy he was “involved in things” that “changed his personality a lot, even in his adult time.” (R.
 
 *1229
 
 2895.) She stated that, as a result of the assignments Deardorff received in the Navy, he became “a little bit harder, not showing his emotions as much as he normally did.” (R. 2896.) On cross-examination, Byrd acknowledged that her son did not receive an honorable discharge from the military. She testified that she disapproved of his actions, and when the prosecutor asked her which actions she disapproved of, she replied, “He felt since the Navy did not fulfill their part of the agreement, he did not fill his. He did not report for duty.” (R. 2901.) She explained that, when Deardorff reenlisted after his first tour of duty, he was promised shore duty; after six months of shore duty, he was ordered to return to sea, she said, so Dear-dorff failed to report for duty. Defense counsel did not object to any of the prosecutor’s questions.
 

 Deardorff then testified on his own behalf. Defense counsel asked Deardorff whether he had anything to say to the jury, and he offered a fairly lengthy monologue addressing, among other issues, his claim that he was innocent of the crime, his desertion from the Navy, and some perceived conflicts in the evidence presented at the guilt phase. Deardorff explained that he worked very hard after he had reenlisted and he told his commanding officer that he was “burned out” and needed to go on leave. He said that he was denied leave and further stated, “I took what’s referred to in military terms as whether leave. I’m taking it whether you give it to me or not. So I took it. I called them. I said I’m not coming in. I’ll be at home when you get ready for me.” (R. 2910.) He also claimed that he was disciplined but remained in the Navy for two additional years because, he said, “I was so good, they kept me around for two more years.” (R. 2911.)
 

 Deardorffs discharge form was admitted into evidence. The form indicates that he was discharged in absentia following a conviction by court martial. (C. 1363.)
 

 Section 13A-5-45(c), Ala.Code 1975, provides, in pertinent part, “At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to aggravating and mitigating circumstances _” Section 13A-5-45(d), Ala.Code 1975, provides, “Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.”
 

 Deardorff argues that the prosecutor’s questions about his desertion from the Navy were improper because, he argues, they were intended solely to “tarnish Donald Deardorffs character in the eyes of the jury” (Appellant’s brief at p. 18) and to prejudice him by implying that he was disloyal. The State argues that no plain error occurred as a result of the testimony about Deardorrfs desertion because the prosecutor’s questions were intended to rebut Byrd’s testimony about her son’s military experience, which was offered as mitigation evidence. We find no plain error in the prosecutor’s questions regarding Deardorrfs desertion from the military because the State was entitled to rebut Dear-dorffs proffered mitigation evidence.
 

 In accordance with § 13A-5-52, Ala.Code 1975, Deardorff was entitled to present evidence of “any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole.... ” As a mitigation witness, Deardorffs mother testified as a character witness that his
 
 *1230
 
 military experience “changed his personality,” thus suggesting that he was somehow more deserving of a sentence of life imprisonment without parole. Deardorffs military experience was relevant and admissible as a nonstatutory mitigating circumstance. Once Deardorff offered this evidence in mitigation, however, the prosecutor was entitled to challenge it. Section 13A-5~45(g), Ala.Code 1975, provides that, once the defendant offers as mitigation evidence a fact that the State disputes, the State “shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.”
 

 In
 
 Jackson v. State,
 
 791 So.2d 979 (Ala.Crim.App.2000), the appellant objected to the prosecutor’s cross-examination of Jackson’s character witnesses, claiming that the evidence was improper because it introduced evidence of his prior bad conduct. We rejected that argument, stating:
 

 “To rebut Jackson’s claim of good character, the State cross-examined one of Jackson’s character witnesses regarding Jackson’s prior misdemeanor assault conviction and his suspension from school for carrying a gun. This cross-examination was proper both to test the witness’s credibility as to his knowledge of Jackson’s character and to rebut the mitigating evidence offered by Jackson.”
 

 791 So.2d at 1026.
 

 We have also held that an appellant’s disciplinary problems in jail were admissible to rebut mitigation evidence he offered regarding his good behavior in jail. In
 
 Clark v. State,
 
 896 So.2d 584, 597 (Ala.Crim.App.2000) (on return to remand and on application for rehearing), we stated:
 

 “Evidence of Clark’s prison disciplinary problems was clearly offered to rebut the evidence he had offered in mitigation that he was a ‘model inmate.’ (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g.,
 
 Jackson v. State,
 
 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934 (2001)(evi-dence of the defendant’s prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant’s mitigation evidence); and
 
 Hallford v. State,
 
 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945 (1989)(evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant’s mitigation evidence regarding his good character).”
 

 Based on the relevant statutes and on previous cases presenting similar circumstances, we find no plain error as a result of the prosecutor’s questioning of Dear-dorffs mother regarding the manner in which Deardorff ended his military service. The evidence was relevant to her credibility as a witness and to rebut the implication that Deardorffs experience in the military supported a sentence of life imprisonment without the possibility of parole. We note, additionally, that Deardorff testified extensively about his military service and about the circumstances surrounding his desertion. He offered his complete explanation for his desertion and his subsequent discharge from the military and the explanation he presented far exceeded the scope of the questions the prosecutor asked Byrd. Finally, we note that the trial court found Deardorffs military experience to be a nonstatutory mitigating circumstance. For all of the foregoing reasons, we find that no plain error occurred and that Deardorff is not entitled to any relief on this claim.
 

 X.
 

 Deardorff argues in Issue III of his initial brief that statutes that impose the
 
 *1231
 
 death penalty in the United States “and in this country” are unconstitutional because, he says, they are arbitrary; they create a substantial risk that an innocent person will be executed; and they result in geographic disparities in the imposition of capital punishment. Deardorff also argues that “[a]ll branches of the state and federal government have imposed numerous procedural barriers to review by appellate courts.” (Appellant’s brief at p. 28.) In Issue X of his initial brief, Deardorff argues that the death penalty in general and, in particular, Alabama’s death penalty scheme, violate the Eighth Amendment to the United States Constitution because the death penalty constitutes cruel and unusual punishment. Deardorff raises these claims for the first time in this Court.
 
 [4]
 
 Therefore, the claims are reviewed only for plain error. We find no plain error.
 

 As for his claim that the death penalty constitutes cruel and unusual punishment, Alabama courts have often held otherwise.
 
 E.g., Martin v. State,
 
 931 So.2d 736 (Ala.Crim.App.2003), and cases cited therein.
 

 The portions of the equal-protection and due-process claims that ■ relate to state statutes other than Alabama’s and to appellate review in federal courts and in state courts other than Alabama’s are not matters within our jurisdiction to consider. Therefore, we do not address them.
 

 The equal-protection and due-process claims that relate to Alabama’s statute and to Alabama’s appellate court review are very general and contain no references to any particular portion of Alabama’s statute or to the proceedings now under review. Deardorffs failure to include any specific claims of equal-protection or due-process violations precludes a finding of plain error.
 

 “Our analysis begins with the basic principle that a defendant who alleges an equal protection violation has the burden of proving ‘the existence of purposeful discrimination.’
 
 Whitus v. Georgia,
 
 385 U.S. 545, 550 (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination ‘had a discriminatory effect’ on him.
 
 Wayte v. United States,
 
 470 U.S. 598 (1985).”
 

 McCleskey v. Kemp,
 
 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(footnote omitted).
 

 The same principle applies with regard to the examination of due-process claims. The United States Supreme Court stated what has become an oft-cited principle, “A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights.”
 
 County Court of Ulster County, N.Y. v. Allen,
 
 442 U.S. 140, 154-55, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
 

 The State correctly argues that Dear-dorff has made no attempt to allege or prove a discriminatory intent or a specific due-process violation. His “boilerplate” allegations regarding alleged inequities, such as his conclusory statement that “the entire death penalty structure in this state and in this country is unconstitutional on its face and should be abolished as such” (Appellant’s initial brief at p. 21), do not establish that any of his rights to due process and equal protection were infringed. Thus, we find no plain error and hold that Deardorff is not entitled to relief on these claims.
 

 
 *1232
 
 XI.
 

 Deardorff next argues that the trial court erred in “double counting” burglary, robbery, and kidnapping as both elements of the capital offenses and as aggravating circumstances. He cites
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in support of his claim. Deardorff did not raise this objection in the trial court, so we review it only for plain error. No plain error occurred here.
 

 The “double counting” of burglary, robbery, and kidnapping as aggravating circumstances is provided for in Alabama’s death-penalty statutory scheme. § 13A-5-45(e), Ala.Code 1975. “Double counting” has been upheld in the United States Supreme Court,
 
 Lowenfield v. Phelps,
 
 484 U.S. 231, 244-45, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and in our appellate courts,
 
 e.g., Ferguson v. State,
 
 814 So.2d 925, 956-57 (Ala.Crim.App.2000),
 
 aff'd,
 
 814 So.2d 970 (Ala.2001), and cases cited therein. Finally, the Alabama Supreme Court has held that “double counting” does not violate
 
 Apprendi. Ex parte Waldrop
 
 859 So.2d 1181, 1186-88 (Ala.2002).
 

 For the foregoing reasons, we hold that no plain error occurred as a result of the trial court’s “double counting” of burglary, robbery, and kidnapping, and that Deardorff is not entitled to any relief on his claim.
 

 XII.
 

 Deardorff next argues that Alabama’s capital-sentencing scheme violates the principles established in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that the statutory scheme is unconstitutional because the trial judge, and not the jury, makes the findings regarding the aggravating and mitigating circumstances and determines the sentence, and because it permits imposition of a death sentence without unanimous jury findings as to the aggravating circumstances. Deardorff failed to raise these claims in the trial court, so we review them now for plain error.
 

 Each of the claims raised here has been considered and rejected by Alabama courts.
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Turner v. State,
 
 924 So.2d 737, 783 (Ala.Crim.App.2002),
 
 opinion on return to remand,
 
 924 So.2d at 793 (Ala.Crim.App.2003), aff
 
 'd on return to second remand,
 
 924 So.2d at 796 (Ala.Crim.App.2003). Deardorff is not entitled to any relief on these newly raised claims.
 

 XIII.
 

 Deardorff argues that reversible error occurred when, during voir dire, the jury was told that its verdict during the penalty phase of the trial would be advisory only and that the trial court would determine the actual sentence. He claims that the statement violated
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because the United States Supreme Court held in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that a jury must determine the sentence. Deardorff does not cite to the portion of the record where this allegedly objectionable comment was made, nor does he identify who made the comment. He did not raise this objection at trial. Therefore, we review the claim for plain error. We find no plain error.
 

 Our review of the record reveals that, on at least one occasion, the prosecutor stated to a venire panel that the jury recommends the punishment during the penalty phase. No error occurred as a result of this statement because it is an accurate statement of the law. Under Alabama law, a jury’s verdict as to the sentence in a capital case is an advisory one.
 
 *1233
 

 See
 
 § 13A-5-46, Ala.Code 1975. Thus, Alabama courts have repeatedly held that a prosecutor’s comments and a trial court’s instructions accurately informing a jury that its sentencing verdict is advisory or is a recommendation do not violate
 
 Caldwell. E.g., Ray v. State,
 
 809 So.2d 875, 883 (Ala.Crim.App.2001), and cases cited therein. To the extent Deardorff argues that the United States Supreme Court’s decision in
 
 Ring
 
 invalidates the foregoing line of cases, this Court has held otherwise.
 

 “In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State’s rationale that
 
 Ring
 
 did not invalidate Alabama’s law, which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g.,
 
 Ex parte Hodges,
 
 856 So.2d 936 (Ala.2003);
 
 Ex parte Waldrop,
 
 859 So.2d 1181 (Ala.2002);
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002);
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001), opinion on return to second remand, 868 So.2d at 1198.”
 

 Duke v. State,
 
 889 So.2d 1, 41-42 (Ala.Crim.App.2003).
 

 There is no merit to Deardorffs claim that a
 
 Caldwell
 
 violation occurred during voir dire proceedings. No plain error occurred and Deardorff is not entitled to any relief on this claim.
 

 XIV.
 

 Deardorff argues that, upon its review of the proportionality of the sentence in this case pursuant to its duty under § 13A-5-53(b)(2), Ala.Code 1975, this Court should remand the case for the imposition of a sentence of life imprisonment without the possibility of parole. Dear-dorff argues that there is no evidence indicating that he is beyond rehabilitation and that this case does not fit into the category of serious cases deserving of the death penalty. Deardorff did not raise this claim at trial. Nonetheless, we will address the propriety of the sentence pursuant to our mandatory review.
 

 Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
 

 After the jury convicted Deardorff of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5^5 and -46, Ala.Code 1975. The jury heard the evidence concerning the aggravating circumstances and the mitigating circumstances and it was properly instructed by the trial court as to the applicable law. The jury was correctly advised as to its function regarding the finding of any aggravating circumstance or circumstances and any mitigating circumstance or circumstances, the weighing of the circumstances it found to exist, and the return of an advisory verdict. The jury recommended a sentence of death by a vote of 10-2.
 

 Thereafter, in accordance with § 13A-5-47, Ala.Code 1975, the trial court held another hearing to aid it in determining whether it would sentence Deardorff to life imprisonment without parole or whether it would follow the jury’s recommendation and sentence him to death. The trial court ordered and received a written presen-tence investigation report, as required by § 13A-5-47(b). The trial court entered a
 
 *1234
 
 thorough sentencing order. That order included written findings of fact summarizing the offense. It also included specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each statutory mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and the nonstatutory mitigating circumstances found to exist under § 13A-5-52, Ala.Code 1975.
 

 In its findings, the trial court found the existence of two statutory aggravating circumstances: that the capital offense was committed while Deardorff was engaged in, or was an accomplice in the commission of, a robbery, burglary, and kidnapping, § 13A-5-49(4), Ala.Code 1975; and that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-48(8), Ala.Code 1975. The trial court included specific fact findings to support the § 13A-5-48(8) aggravating circumstance. The trial court found that no statutory mitigating circumstances existed. The court found as non-statutory mitigating circumstances Dear-dorffs troubled family life as a child, his past life experiences, and his military service. The court also considered Dear-dorffs continuing assertion of his innocence.
 

 The trial court found that aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate sentence. The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor.
 
 See
 
 § 13A-5-53(b)(1), Ala. Code 1975. As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the appellant’s sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. We find that it is not disproportionate or excessive. Deardorff committed a murder during the course of a robbery, a burglary, and a kidnapping. Similar crimes have been punished by death throughout this State.
 
 E.g., Harrison v. State,
 
 869 So.2d 509 (Ala.Crim.App.2002), and cases cited therein (robbery-murder);
 
 Harris v. State,
 
 854 So.2d 145 (Ala.Crim.App.2002), and cases cited therein (burglary-murder and robbery-murder);
 
 Lewis v. State,
 
 889 So.2d 623 (Ala.Crim.App.2003), and cases cited therein (kidnapping-murder and robbery-murder).
 

 The trial court’s findings are fully supported by the evidence presented. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, and we believe that the trial court correctly determined that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death is the appropriate sentence in this case.
 

 Conclusion
 

 We have performed our statutorily mandated review of the proceedings below, including our review for plain error, Rule 45A, Ala. R.App. P., and we have reviewed the propriety of the death sentence. We conclude that Deardorffs convictions for capital murder and his sentence of death are due to be, and are now, affirmed. As discussed in Part II of this opinion, however, the convictions and sentences for theft in Counts 9, 11, 13, 15, 17, 19, and 21 are due to be vacated because those convictions violated Deardorffs double-jeopardy rights. Therefore, we remand this cause to the trial court for that limited purpose — to vacate those convictions and sentences. Due return is to be made to this Court within 28 days of the date of this opinion.
 

 AFFIRMED IN PART AND RE
 
 *1235
 
 MANDED WITH DIRECTIONS.
 

 McMILLAN, P J, and BASCHAB, SHAW, and WISE, JJ., concur.
 

 [1]
 

 . The handgun recovered from die car was the handgun Dawn Dunaway, Peacock’s girlfriend, has told Peacock was missing from her house.
 

 [2]
 

 . It is unclear from the record whether Dear-dorff used the term "gig” or "jig.”
 

 [3]
 

 . Although the State contends in footnote 1 of its supplemental brief to this Court that Dear-dorff argues that Count 23, receiving stolen property, should also be vacated, we disagree with the State's interpretation of Deardorffs argument on this issue. In the initial portion of his discussion of this issue, Deardorff lists all of the charges of which he was convicted, including the receiving stolen property charge. Deardorff then argues only that the theft convictions should be vacated because they were encompassed in the greater offenses. Because Deardorff does not seek to have the receiving conviction vacated, we do not address the merits of tire State’s argument. We note, however, that Count 23 charged an offense unrelated to the thefts of Turner's property.
 

 [4]
 

 . Deardorff filed a post-trial motion, but that motion challenged the constitutionality of electrocution as a means of punishment and did not challenge the constitutionality of capital punishment per se.